

# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-10-00278-CV

SCOTT R. LEAKE AND SUSAN E.
LEAKE, INDIVIDUALLY AND ON
BEHALF OF THE
ARCHITECTURAL CONTROL
COMMITTEE OF THE SUNNY
MEADOWS ADDITION

APPELLANTS

V.

THERMAN M. CAMPBELL, JR. AND
SUSAN M. CAMPBELL

APPELLEES

----------

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY

----------

## OPINION

----------

Appellants Scott R. and Susan E. Leake, individually and on behalf of the Architectural Control Committee of Sunny Meadows Addition, appeal from the trial court's summary judgment in favor of appellees Therman M. and Susan M. Campbell. In two issues, the Leakes claim that the trial court reversibly erred by

denying their motion for summary judgment while granting the Campbells' and by awarding attorney's fees to the Campbells. We reverse and remand.

## Background Facts

The Campbells purchased their home at 3102 Sunny Meadows Court, Dalworthington Gardens, Tarrant County, Texas, on December 27, 2007. The Leakes are the Campbells' neighbors and have lived at 3104 Sunny Meadows Court since July 31, 1990. The housing community in which they all reside, Sunny Meadows Addition, is subject to recorded deed restrictions. The part of the restrictive covenants that are pertinent to this case are the following:

> For the purpose of creating and carrying out a uniform plan for the improvements and sale of the lots, blocks and homesite tracts to be made from the land described herein, the following restrictions upon the use of said property are hereby established and shall be referred to, adopted and made a part of each and every contract and deed executed. . . .
>
> . . . .
>
> (3) No structure shall be erected, altered, placed or permitted to remain on any lot carved from the above described property other than one single family dwelling not to exceed (except by Architectural Control Committee approval) two stories in height, private attached or detached garage or carport for not more than four (4) cars facing a direction other than the street, and reasonable outbuildings for single family use. . . .
>
> (4) No house, dwelling and/or other structure of any kind or character whatsoever may be moved into any lot carved out of the property described herein.
>
> . . . .
>
> Architectural Control: No building shall be erected, placed or altered on any lot until the construction plans, specifications, and a plan

showing the location of the structure shall have been approved by the Architectural Control Committee. . . . Approval shall be as provided in Paragraph 3 below.

Procedure: Committee's approval for [sic] disapproval as required by this covenant shall be in writing. In the event the committee or it's [sic] designated representative fails to approve or disapprove within 15 days after plans, specifications and plot plan have been submitted to it *or in any event* if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the restrictive covenants herein contained shall be deemed to have been fully complied with.

(4) These restrictions are for the benefit of and shall inure to each and every property owner in this addition, and may be enforced by anyone [sic] or more of such property owners and they shall be allowed to recover from a violating party, all costs and attorney fees and out-of-pocket expenses incurred in enforcement of any covenants herein whether by judicial means or settlement. [Emphasis added.]

The Campbells claim that they were unaware of the deed restrictions when they purchased their property while the Leakes claim that they specifically chose the community because of its deed restrictions.

After the Campbells purchased their home, they sought to make improvements to the property. On January 8, 2008, Tuff Shed constructed a storage shed on the Campbells' property. According to Therman Campbell, Tuff Shed employees constructed the shed on-site.[1] In addition to the shed, Therman wished to build a carport and shelter for his motor home. As a first step, he began to pour a concrete pad and driveway on January 21, 2008; he completed

---

[1] The Leakes claim that the shed was preassembled off-site and placed on the Campbells' property.

3

the work on January 26, 2008. Next, Therman purchased a spa, along with a cabana to cover and enclose the spa, on February 4, 2008. The installation of the spa and construction of the cabana both occurred on February 11, 2008. Lastly, Therman sought to have an RV shelter installed. Before doing so, Therman approached Scott Leake in April 2008 seeking approval for his plans. Scott conveyed his disapproval with the plans and directed Therman's attention to the restrictive covenants barring this type of construction. According to Scott, immediately after this conversation, he informed ACC member Mark Appling of Therman's plan to construct an RV shelter. According to Appling, he went to the Campbells' home that same day and informed Therman of the restrictive covenants and the likelihood that the RV shelter would be in violation of those restrictive covenants. Within a week Appling hand delivered a copy of the restrictive covenants to Therman. Therman nevertheless had the RV shelter constructed on May 5, 2008.

On May 10, 2008, Appling went to the Campbells' home and informed them that the shed, cabana, and RV shelter were not in compliance with the restrictive covenants. On the following day, Therman wrote to the ACC requesting a variance for the three structures. On or about May 20, 2008, Therman received a letter from Kerry Moseley, a member of the ACC and one of the developers of the subdivision, informing Therman that his request for a variance was denied and instructing the Campbells to remove the shed, cabana, and RV shelter at once. The letter went on to specify the reasons for denying the

4

Campbells' variance, which included not seeking the ACC's approval before installation and construction of the three structures. Campbell responded with another letter, imploring the ACC to reconsider its findings. The ACC remained unpersuaded, and the structures remained on the Campbells' property.

The Leakes sued the Campbells on November 13, 2008, seeking a declaratory judgment that the structures are in violation of the restrictive covenants, a permanent injunction ordering the Campbells to remove the structures, and attorney's fees. The Campbells filed their first amended original answer and counterclaim on November 30, 2009, in which they raised the affirmative defenses of waiver, estoppel, and violation of section 202.004(a) of the property code and also pled for attorney's fees under the Uniform Declaratory Judgments Act. Tex. Civ. Prac. & Rem. Code Ann. § 37.009 (West 2008); Tex. Prop. Code Ann. § 202.004(a) (West 2007) ("An exercise of discretionary authority by a property owners' association or other representative designated by an owner of real property concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was arbitrary, capricious, or discriminatory."). The Campbells then filed a traditional summary judgment motion claiming that the structures were deemed approved under the deed restrictions because the lawsuit had not been filed until after the completion of construction. The Leakes filed a response and their own traditional and no-evidence motions for summary judgment, claiming that the structures violate the

5

restrictive covenants as a matter of law and that the Campbells had not brought forward any evidence of a waiver of a right to enforce the restrictive covenants or a violation of property code section 202.004(a). At the conclusion of a hearing on both motions, the trial court granted the Campbells' motion for summary judgment, denied the Leakes' motion, and awarded the Campbells attorney's fees in the amount of $10,348 and costs of $305.32.

**Standard of Review**

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010), *cert. denied*, 131 S. Ct. 1017 (2011); *see* Tex. R. Civ. P. 166a(b), (c).

When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Mann*

6

*Frankfort*, 289 S.W.3d at 848; *see Myrad Props., Inc. v. Lasalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009). The reviewing court should render the judgment that the trial court should have rendered. *Mann Frankfort*, 289 S.W.3d at 848.

## Propriety of Summary Judgment for the Campbells

In their first issue, the Leakes claim that the trial court erred in granting summary judgment to the Campbells and denying their motion for summary judgment because the court based its decision on an erroneous construction of the restrictive covenants.

### Interpretation of Restrictive Covenants

We review a trial court's interpretation of a restrictive covenant de novo. *Raman Chandler Props, L.C. v. Caldwell's Creek Homeowners Ass'n*, 178 S.W.3d 384, 390–91 (Tex. App.—Fort Worth 2005, pet. denied); *Air Park–Dallas Zoning Comm. v. Crow Billingsley Airpark, Ltd*., 109 S.W.3d 900, 909 (Tex. App.—Dallas 2003, no pet.). We construe restrictive covenants in accordance with general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *Raman Chandler*, 178 S.W.3d at 391. Whether restrictive covenants are ambiguous is a question of law. *Raman Chandler*, 178 S.W.3d at 391; *Dyegard Land P'ship v. Hoover*, 39 S.W.3d 300, 308–09 (Tex. App.—Fort Worth 2001, no pet.). A covenant is unambiguous as a matter of law if it can be given a definite or certain legal meaning. *Pilarcik*, 966 S.W.2d at 478; *Raman Chandler*, 178 S.W.3d at 391. Mere disagreement over the interpretation of a

7

restrictive covenant does not render it ambiguous. *Air Park–Dallas*, 109 S.W.3d at 909. An unambiguous restrictive covenant should be liberally construed to give effect to its purpose and intent. Tex. Prop. Code Ann. § 202.003(a) (West 2007); *Dyegard Land P'ship*, 39 S.W.3d at 308–09.

**Analysis**

Here, both motions for summary judgment hinge on the proper interpretation of the "in any event" deemed approval provision found under the right to enforce section of the restrictive covenants:

> In the event the committee or its [sic] designated representative fails to approve or disapprove within 15 days after plans, specifications and plot plan have been submitted to it *or in any event* if no suit to enjoin the construction has been commenced prior to the completion thereof, approval will not be required and the restrictive covenants herein contained shall be deemed to have been fully complied with. [Emphasis added.]

While each party agrees that the language is unambiguous, each interprets it differently. The Leakes contend that the deemed approval language is effective only after plans and specifications have been submitted to the ACC in writing by a homeowner. Thus, under the Leakes' interpretation, the "in any event" language does not apply to situations in which the homeowner fails to seek approval before beginning and completing construction. On the other hand, the Campbells claim that in conformance with this court's opinion in *Buckner v. Lakes of Somerset Homeowners Ass'n*, 133 S.W.3d 294 (Tex. App.—Fort Worth 2004, pet. denied), the phrase allows for deemed approval of violations in *any* situation other than those in which the ACC has given its approval or has failed to

8

disapprove of plans, e.g., when the ACC disapproves but fails to enjoin construction of violating structures before their completion. According to the Campbells, it does not matter whether plans are submitted before construction because a plain reading of "in any event" suggests an acceptance of all scenarios. The Leakes claim *Buckner* should not control here.

As both parties make clear in their respective briefs, our decision turns on our prior opinion in *Buckner.* In *Buckner*, a homeowner sought approval of a roofing material from the subdivision's ACC but began installing the roof without waiting for the ACC's decision. *Id.* at 295. The ACC eventually disapproved the roofing materials, but the homeowner continued to complete the roof with the disapproved materials. *Id*. Although communications between the homeowner and ACC took place over the course of at least a month, the homeowners' association did not file suit until after the homeowner had completed the roof. *Id*. at 295–96, 298. The "deemed approval" language in that case stated as follows:

> [N]or shall any exterior addition to or change or alteration therein be made until the details . . . shall have been submitted to and approved in writing . . . by [the ACC]. . . . In the event the [ACC] fails to approve or disapprove any such detail, design, plan, specification or location within thirty (30) days after submission to it, *or in* **any** *event if no suit to enjoin has been commenced prior to the completion thereof, approval will not be required and this Article will be deemed to have been fully complied with.*

*Id*. at 296–97.

We held that the above language

is unambiguous. After describing one manner in which approval will be deemed, in *the* event the ACC fails to approve or disapprove

9

submitted plans within 30 days after submission, the article continues by describing another manner of deemed approval: LSHOA's failure to file suit before the roof is complete. The use of the word "any" shows an intent to describe all scenarios other than those in which the ACC gives its explicit approval or fails to disapprove submitted plans within 30 days: <u>when the homeowner has not complied with Article VI by requesting preapproval</u> or when the ACC has denied approval and the homeowner continues making alterations in accordance with the disapproved plans. LSHOA's proposed interpretation would render the "in any event" language meaningless; if the ACC does not approve or disapprove of the submitted plans within 30 days, the plans are deemed approved in accordance with Article VI. Thus, a subsequent suit to enjoin activities completed in accordance with such plans would be pointless because LSHOA would lose.

LSHOA contends that *Pilarcik v. Emmons* controls this issue because the supreme court construed the same language in that case and determined that "the covenants [in that case] dictate default consequences in the event the ACC does not act swiftly enough." 966 S.W.2d at 480. The covenant in *Pilarcik* is almost identical to the covenant in this case. LSHOA contends that the quoted language indicates that "default consequences" should occur *only* if the ACC does not approve or disapprove of a homeowner's plans timely enough. However, in *Pilarcik* a group of individual homeowners, rather than the homeowners association, sued the nonconforming homeowner, and the issue was whether the ACC could *grant* approval of nonconforming materials *after* the 30 day period had expired. *Id*. at 476, 479–80. The homeowners filed suit when the roof was 98 percent complete; thus, the second part of the covenant, which is at issue in this case, was not at issue in that case. *Id*. at 477. Further, the quoted language from *Pilarcik* supports our conclusion: by not filing suit before the Buckners completed construction of their new roof, i.e., by not acting swiftly enough, LSHOA may suffer default consequences, i.e., the nonconforming roofing materials being deemed approved.

*Id*. at 297–98 (underlining added).

We agree that if we were bound to follow the underlined language above in

*Buckner*, we would affirm the summary judgment for the Campbells. However, a

10

more careful reading of the restrictive covenants in *Buckner* and in this case compels us to conclude that the underlined language above was not necessary to the disposition in *Buckner* and was, therefore, dictum. In addition, that underlined language conflicts with another provision of the restrictive covenants in this case and in *Buckner*. In the present case, the provision reads,

> [T]he owner or owners of any of the above land shall have the right to sue for and obtain an injunction, prohibitive or mandatory, to prevent the breach of or to enforce the observance of the restrictions, in addition to ordinary legal actions for damages, and *failure to of the parties or owner or owners of any of the lot or lots . . . to enforce any of the restrictions herein set forth at the time of its violation shall in no event, be deemed to be a waiver of a right to do so thereafter*.

[Emphasis added.] The covenants in *Buckner* contained substantially similar language. *See Moore v. Zeller*, 153 S.W.3d 262, 264 (Tex. App.—Beaumont 2004, pet. denied) (holding that appellate court may judicially notice its own records); *Stroud v. VBFSB Holding Corp.*, 917 S.W.2d 75, 78 (Tex. App.—San Antonio 1996, writ denied) (holding same).

In the present case, the no-waiver language is found in the first section of the Right to Enforce section of the restrictions. The language about deemed approval is found two sections later in the Architectural Control Committee section that discusses the procedure for approval or disapproval of plans that are actually presubmitted to the ACC for review. To construe these seemingly conflicting provisions in a way that does not render the covenants meaningless compels only one conclusion: the "in any event" deemed approval language

11

applies only when a homeowner actually submits plans to the ACC for matters which require preapproval by the ACC and the ACC fails to act within the specified time period. *See Pavecon, Inc. v. R-Com, Inc.*, 159 S.W.3d 219, 222 (Tex. App.—Fort Worth 2005, no pet.) ("We are to interpret a contract in such a manner that none of its provisions will be rendered meaningless."); *see also MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).[2] In other words, the no-waiver language applies generally, and the "in any event" language is a carveout that applies only if the ACC has been put on notice that a homeowner is seeking to make alterations that require approval under the applicable restrictions. This is not to say that the analysis or result in *Buckner* was incorrect, but only that the statement that the "in any event" deemed approval language applies even "when the homeowner has not complied with Article VI by requesting preapproval" was unnecessary and not applicable to the facts before the court in that case. Therefore, we now limit the holding in *Buckner* to apply only to scenarios in which a property owner subject to restrictions that contain substantially similar "in any event" language seeks

---

[2]Courts in other states have come to the same conclusion. *See Bramlett v. Dauphin Island Prop. Owners Ass'n*, 565 So.2d 216, 218 (Ala. 1990); *Carriage Hills Golf and Country Club, Inc. v. Hertz*, 305 So.2d 287, 288–89 (Fla. Dist. Ct. App. 1974); *Emonet v. Tomlinson*, 163 So.2d 382, 384–85 (La. Ct. App.), *writ ref'd*, 246 La. 591 (1964); *Keller v. Branton*, 667 P.2d 650, 652–53 (Wyo. 1983). *But see Garden Quarter I Ass'n v. Thoren*, 394 N.E.2d 878, 880–81 (Ill. 1979); *Aurora Shores Homeowners Ass'n v. Hardy*, 37 Ohio App. 3d 169, 69–70 (Ohio Ct. App. 1987). The Illinois and Ohio cases do not say whether the restrictive covenants in those cases contained saving "no waiver" language as did the restrictive covenants here.

12

preapproval from the ACC as required by the restrictions and nevertheless completes the construction without the ACC's approval before the ACC files a suit to enjoin the construction.[3]

Here, unlike in *Buckner*, the Campbells never sought the ACC's approval before commencing construction of the shed, cabana, and RV shelter. Only after construction was completed, and after the ACC sent a letter demanding removal of the three structures, did the Campbells seek a variance. Thus, the "in any event" language was never triggered in this case, and the ACC was not required to file suit to enjoin the Campbells' construction before that construction was completed.

Accordingly, we conclude and hold that the trial court erred by granting the Campbells' summary judgment. We sustain the Leakes' first issue in part.

**Propriety of Denial of Leakes' Motion for Summary Judgment**

The Leakes also contend in their first issue that the trial court erred by denying their traditional and no-evidence motions for summary judgment.

In their traditional motion for summary judgment, the Leakes claim that they conclusively proved that the RV shelter, cabana, and shed violate the restrictive covenants. Specifically, they argue that the RV shelter is a private carport facing the street in violation of article 1, section 3 of the restrictions, that

---

[3]We also note that *Buckner* did not involve a scenario in which construction was begun or completed in a clandestine manner or in which construction was capable of completion within a day or a few hours. *See Riordan v. Hale*, 212 S.E.2d 65, 67–68 (Va. 1975).

13

the cabana covering the spa and the Tuff Shed are not "reasonable outbuildings for single family use" as allowed by article 1, section 3, and that the cabana and shed were preassembled off-site and moved onto the property in violation of article 1, section 4 of the restrictions. In addition, they also claim that the Tuff Shed violates article 1, section 9's prohibition against roofs having asphalt composition shingles.[4]

The Leakes contend that the shed, cabana, and RV shelter violate article 1, section 3 of the covenants, which provide as follows:

> No structure shall be erected, altered, placed or permitted to remain on any lot carved from the above described property other than one single family dwelling not to exceed (except by Architectural Control Committee approval) two stories in height, private attached or detached garage or carport for not more than four (4) cars facing a direction other than the street, and reasonable outbuildings for single family use.

According to the Leakes, the shed and cabana are not "reasonable outbuildings," and the RV shelter is an impermissible carport or garage facing the street. The Leakes did attach a photograph to their motion for summary judgment, which appears to be of the side of the RV shelter and which appears to show that it is partially enclosed about halfway down the sides and that at least part of the structure is open to the street; the shelter, however, according to the Leakes' own summary judgment evidence is on the back quarter of the Campbells'

---

[4]The Leakes did not move for summary judgment on the ground that the structures were in violation of paragraph 2 of the Right to Enforce section of the restrictive covenants.

property, is separated from the street by a private driveway and is further separated from the driveway by an open metal fence.

The Leakes did not present any evidence that a storage shed or cabana would not be a "reasonable outbuilding[] for single family use." Black's Law Dictionary defines an outbuilding as "[a] detached building (such as a shed or garage) within the grounds of a main building." Black's Law Dictionary 1211 (9th ed. 2009). The Leakes attached to their motion a drawing showing that the shed and cabana are located directly behind the residence such that it is unlikely that they are visible from the majority of the street frontage. But they did not provide any photographs of the shed or cabana, and, thus, no evidence that their size is inherently unreasonable; neither did they bring forward any evidence that those buildings would be used for any purpose other than "single family use." Furthermore, they have not provided any evidence that use of a cabana to cover a spa or a shed for storing personal belongings is a per se unreasonable use for a residence.

As to the RV shelter, the restrictive covenants provide that any detached garage or carport must not face the street. Article 1, section 17 of the restrictive covenants provides that a "motor home or any recreational vehicle . . . . must be stored or parked in a fenced or enclosed area in the back 1/4 of the property or the garage as space will allow." Thus, the restrictions allow a homeowner to place a "fenced or enclosed area" separate from a garage on the back one-fourth of the homeowner's property for the purposes of parking a recreational vehicle.

15

Article 1, section 17 does not contain the same prohibition on facing the street as to the "fenced or enclosed area" used for parking an RV as it does for a detached garage or carport. Thus, although the Leakes do not specifically state their argument this way, they must be contending that because the shelter more resembles a carport than a "fenced or enclosed area," it is subject to the restriction that it not face the street.

The restrictive covenants do not define "enclosed area." Black's Law Dictionary defines an "enclosure" as "[l]and surrounded by some visible obstruction" or "[a]n artificial fence around one's estate." Black's Law Dictionary 607 (9th ed. 2009). It defines "enclose" as "[t]o surround or encompass; to fence or hem in on all sides." *Id.* Webster's Dictionary defines "enclosure" as "the act or action of enclosing: the quality or state of being enclosed; something that encloses; something enclosed." *City of Alamo Heights v. Boyar*, 158 S.W.3d 545, 551 (Tex. App.—San Antonio 2005, no pet.) (quoting Webster's Ninth New Collegiate Dictionary 409 (9th ed. 1991)). It further defines "enclose" as "to close in: surround; to fence off (common land) for individual use; to hold in: confine." *Id.*

In *Boyar*, the San Antonio Court of Appeals held that homeowners who erected screens over the top and sides of their backyard sufficiently enclosed the backyard so that the screens could be considered an "enclosure" for city ordinance purposes even though wind, rain, and sunlight could still enter their yard. 158 S.W.3d at 548 & n.1, 551–52. However, in a criminal case construing

the meaning of "enclosed area" for purposes of the burglary statute, the court of criminal appeals held that a structure made of concrete blocks with three doorways that were incapable of being closed was not an "enclosed area." *See Day v. State*, 534 S.W.2d 681, 684–85 (Tex. Crim. App. 1976) ("To hold that a structure of the design shown here is a building within the definition in Sec. 30.01, . . . would expand the scope of structures which may be the object of burglary to include open air stages with three walls and a roof, or open carports with walls on both sides but none on the ends, or even four-columned pavilions with no walls. The structure here is no more an enclosed structure than the examples just listed."); *see also Hudson v. State*, 737 S.W.2d 838, 839–40 (Tex. App.—Dallas 1987, pet. ref'd) (holding that open walkway between two buildings was not enclosed area for purposes of solicitation of a minor statute).

Here, like the building in *Day*, the RV shelter appears to be designed for the purpose of protecting the RV from the elements rather than enclosing it so that it is not readily visible from the street. *See Day*, 534 S.W.2d at 684–85. Thus, we conclude and hold that it is not an "enclosed area" for purposes of article 1, section 17. Accordingly, we conclude and hold that the shelter is more in the nature of a detached carport, which according to article 1, section 3, may not face the street. The Campbells did not present any evidence controverting the Leakes' evidence that the RV shelter faces the street. We therefore further conclude and hold that the Leakes proved that the RV shelter violates the restrictive covenants as a matter of law. However, as we discuss below, the

17

Leakes were not entitled to the injunctive relief they sought in their motion for summary judgment because the Campbells brought forward evidence to defeat the Leakes' no-evidence summary judgment on their affirmative defenses.

As evidence that the cabana and shed violate article 1, section 4, the Leakes presented a letter from the ACC to the Campbells objecting to the cabana and shed because they were moved onto the property. However, the Campbells presented affidavit evidence that the cabana and shed were both assembled and installed on the property. Accordingly, we conclude and hold that there is a fact issue as to whether the cabana and shed violate article 1, section 4 of the restrictive covenants.

Regarding the shed's violating article 1, section 9, the Leakes presented no evidence that the roof of the shed is composed of asphalt composition shingles. Accordingly, we conclude and hold that they were not entitled to summary judgment that the shed violates article 1, section 9.

The Leakes also claim that the Campbells failed to raise any evidence in support of their affirmative defenses of waiver and violation of section 202.004(a) of the property code. However, the Campbells responded with affidavit evidence from Therman that at least four other homes in the subdivision, which consists of only fifteen homes and two streets, have garages or carports facing the street. Article 1, section 3 does not state that a garage or carport may not face the street unless the ACC first gives its approval; thus, this is at least some evidence that the ACC has abandoned enforcement of that particular provision. *See*

18

*Tanglewood Homes Ass'n v. Henke*, 728 S.W.2d 39, 43–44 (Tex. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.).

Additionally, the Campbells presented affidavit evidence from Therman that when he first approached Scott Leake about the RV shelter, Scott stated, "It won't matter, I won't like it anyway . . . . do what ever you want." Although there is no evidence that Scott is a member of the ACC, the ACC did authorize him and his wife to sue to enforce the restrictive covenants. Therman also averred in his affidavit that he was never notified of any hearing on the request for a variance; that no one ever came to inspect the shed, cabana, and RV shelter; and that no one ever called him to discuss the dimensions or cost of the cabana, shed, and shelter. Taken together, this evidence—along with the evidence above about the other homes with garages and carports facing the street and the fact that the Leakes have not conclusively proven that the shed or cabana violate the restrictive covenants—is at least some evidence that the ACC's decision was "arbitrary, capricious, or discriminatory." *See* Tex. Prop. Code Ann. § 202.004(a); *Whittier Heights Maint. Ass'n v. Colleyville Home Owners' Rights Ass'n*, No. 02-10-00351-CV, 2011 WL 2185699, at *4 (Tex. App.—Fort Worth June 2, 2011, no pet.) (mem. op.). We therefore conclude and hold that the trial court did not err by denying the Leakes' motion for summary judgment.

### Attorney's Fees

In their second issue, the Leakes claim that the trial court erred when it awarded attorney's fees to the Campbells in the amount of $10,348 plus $305.32

in costs. Having determined that the trial court erred by granting summary judgment for the Campbells, we reverse the award of attorney's fees and costs. Although the Leakes also challenge the trial court's refusal to grant them their attorney's fees, we overrule that complaint because we have held that the trial court did not err by denying their motion for summary judgment. We thus sustain their second issue in part and overrule it in part.

## Conclusion

Having sustained the Leakes' first and second issues in part, we reverse the trial court's summary judgment and award of attorney's fees to the Campbells and remand this case for further proceedings in accordance with this opinion.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GABRIEL, JJ.

GABRIEL, J. concurs without opinion.

DELIVERED:  August 31, 2011

20