

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-15-00034-CV

JOSH AND KELLI SAVERING,
CHATTANYA CHAVDA,
PANNABEN NANCHA, PHILLIP
AND LISA KLOTZ, PAUL
ARSENEAU, ALLISON
BLACKSTEIN, AND JACK A.
MUHLBEIER

APPELLANTS

V.

CITY OF MANSFIELD

APPELLEE

----------

FROM THE 348TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 348-270155-14

----------

## OPINION ON EN BANC RECONSIDERATION

----------

Appellants filed a further motion for en banc reconsideration of the majority opinion on rehearing that issued in this cause on May 26, 2016. We grant the motion, withdraw the opinion on rehearing and judgment dated May 26, 2016, and substitute the following.

# I. INTRODUCTION

Appellants Josh and Kelli Savering, Chattanya Chavda, Pannaben Nancha, Phillip and Lisa Klotz, Paul Arsenau, Allison Blackstein, and Jack A. Muhlbeier appeal from an interlocutory order denying their amended application for a temporary injunction. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (West Supp. 2016). In a single issue, divided into several subparts, Appellants argue that the trial court abused its discretion by denying their application because they established each legal and evidentiary requirement for temporary injunctive relief. We agree and will therefore reverse and remand.

# II. BACKGROUND

In November 1995, The Arbors at Creekwood Partners Joint Venture, Phase II, filed a Plat Revision (the Plat) in the Tarrant County records for the purpose of developing a residential community in Mansfield called The Arbors of Creekwood. The Plat divided most of lots 52 through 71 into "R1" and "R2" lots and contained a number of conditions of approval. The Plat's first Condition stated that the R2 lots—which are located along Creekwood's northern and western borders and run adjacent to Walnut Creek—"are intended for public recreation use." Appellants included the following demarcated plat in their brief's appendix, which we reproduce here solely to provide context:



The R2 lots are outlined in red, the floodways are outlined in blue, and the jogging path is marked in green. The R1 residential lots abut the R2 lots along the eastern and southern parts of the development.

On December 11, 1995, the Joint Venture filed its Declaration of Covenants, Conditions and Restrictions for The Arbors of Creekwood–Gated Community (the Declaration). Among other things, the Declaration defines numerous terms used therein, sets out the rights to be exercised and the functions to be performed by The Arbors of Creekwood–Gated Community Homeowners Association, Inc. (the HOA), and includes various provisions regarding Creekwood's "Common Properties," including one which states that "[t]he [HOA] will hold record fee simple title to the . . . Common Properties." The

3

Declaration, which became effective upon its filing, also specified that the streets are private, and it required the Joint Venture to install a "mechanical system that limits vehicular access to the Streets from public streets."

Soon after the Joint Venture recorded the Declaration, it executed a warranty deed on December 22, 1995, that purportedly conveyed the R2 lots to the Communities Foundation of Texas, Inc. (the Foundation). Years later, in December 2012, the Foundation executed a deed that purportedly conveyed the R2 lots to the Mansfield Park Facilities Development Corporation (the Park Corporation), the entity responsible for administering the City's parks and recreation budget.

Between 1995 and 2013, both the homeowners whose properties border the R2 lots and the HOA maintained the R2 lots. Although residents in an adjacent neighborhood could access the jogging trail on the R2 lots through a point located between two residences, the public could not access the R2 lots by crossing Walnut Creek. The area was therefore enjoyed primarily by the residents of Creekwood. This changed in 2014.

In 2013, the City constructed a bridge over Walnut Creek that connects the jogging trail on the R2 lots to a trail in a public park located on the opposite side of the creek. This prompted Appellants—whose residential properties abut the R2 lots—to initiate this litigation just before the bridge opened in late January 2014. Seeking injunctive relief and to quiet title to the R2 lots, Appellants challenged the City's claim that it owned the property comprising the R2 lots,

averring that the lots had instead been conveyed to the HOA, by the Declaration, as part of the Common Properties. The trial court denied Appellants' application, and the bridge opened, permitting the public to access the R2 lots by using the bridge to cross Walnut Creek.

Later, after the HOA had intervened and failed to approve a mediated settlement agreement between the parties, Appellants filed their fourth amended petition and an amended application for temporary injunctive relief, asserting a claim for trespass; arguing that the Joint Venture had conveyed the R2 lots to the HOA by dedication in the Declaration before conveying them to the Foundation by deed; and asking the trial court to temporarily enjoin the City from entering, or encouraging others to enter, Creekwood.[1]

At the hearing on Appellants' amended application, Kelli Savering testified that when she and her husband bought their house in 2011, they were not told that the land located behind it was a public park; rather, they believed that Creekwood was a gated community.[2] Savering explained that the bridge has given the public direct, unfettered access to the R2 lots behind her house, and she estimated that between 25 and 100 people on weekdays and between 100 and 250 people on weekends now use the R2 lots. Although she acknowledged that the majority of people who cross the bridge remain on the jogging trail,

---

[1]Appellants also sought to require the City to place a temporary barricade on the bridge and to place a "no trespassing" sign on the barricade.

[2]Three sets of gates affect vehicular access to Creekwood.

5

Savering explained that a number of people trespass onto the R1 lots, and she lamented that her family's sense of privacy had been lost.

Michael Goodrich, an attorney hired by Appellants to render an opinion about the ownership of the R2 lots, opined that the HOA holds fee simple title to the R2 lots because the Common Properties, whose Declaration definition encompasses the R2 lots, were conveyed to the HOA by the Declaration. Contrary to Appellants' position, Brian Brandstetter, vice president of the HOA's Board of Directors, testified that the HOA's Board had determined that the HOA does not own the R2 lots. During closing arguments, the City clarified that it had not acquired the R2 lots by dedication in the Declaration; the City maintains that the Park Corporation has title to the R2 lots as a result of the December 22, 1995, and December 2012 deeds. The trial court denied Appellants' application, and this accelerated, interlocutory appeal followed.

### III. TEMPORARY INJUNCTIVE RELIEF

Appellants argue in their only issue that the trial court abused its discretion by denying their request for a temporary injunction. They contend that they have the right to pursue injunctive relief and that they conclusively established both a probable right to relief on their trespass and breach-of-restrictive-covenants claims and a probable, irreparable injury in the interim. The City challenges every aspect of Appellants' appeal, responding that they lack standing to seek, and failed to establish the requirements for, temporary injunctive relief.

6

## A.    Standard and Scope of Review

The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits.  *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g).  A temporary injunction is an extraordinary remedy and will not issue as a matter of right.  *Id.*  To obtain a temporary injunction, an applicant must plead and prove (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.  *Id.*  To establish a probable right to relief, a party is not required to prove that it will prevail at a final trial in order to invoke the trial court's discretion to grant a temporary injunction.  *Oil Field Haulers Ass'n v. R.R. Comm'n*, 381 S.W.2d 183, 196 (Tex. 1964).  Rather, a probable right of recovery is shown by alleging a cause of action and presenting evidence tending to sustain it.  *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 220 (Tex. App.—Fort Worth 2009, pet. denied), *cert. denied*, 559 U.S. 1036 (2010).

Whether to grant or deny a temporary injunction is within the trial court's sound discretion.  *Butnaru*, 84 S.W.3d at 204*.*  A trial court abuses its discretion if the court acts without reference to any guiding rules or principles, that is, if the act is arbitrary or unreasonable.  *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004).

7

## B.     Construction Rules

The parties' issues and arguments require us to construe the Declaration. We apply general rules of contract interpretation when construing a declaration of covenants. *See Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *Harris Cty. Flood Control Dist. v. Glenbrook Patiohome Owners Ass'n*, 933 S.W.2d 570, 580 (Tex. App.—Houston [1st Dist.] 1996, writ denied). Our primary duty is to ascertain the parties' objective intent from the language used in the entire instrument. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 524–25 (Tex. 1982); *Cooke v. Morrison*, 404 S.W.3d 100, 113 (Tex. App.—Houston [1st Dist.] 2013, no pet.). We strive to harmonize and give effect to all the provisions so that none are rendered meaningless. *See J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

## C.     Probable Right to Relief—Trespass

Appellants argue in the first part of their only issue that they established a probable right to relief on their pleaded claim for trespass because the Joint Venture conveyed the Common Properties—which include the R2 lots—to the HOA by dedication in the Declaration before conveying the R2 lots by warranty deed to the Foundation. Because the December 11, 1995 dedication preceded the December 22, 1995 conveyance by deed, the Joint Venture held no title to the R2 lots to convey to the Foundation, and the City's actions on the R2 lots— including the construction of a bridge over Walnut Creek—constitute trespass,

8

according to Appellants.[3]  *See United Food & Commercial Workers Int'l Union v. Wal-Mart Stores, Inc.*, 430 S.W.3d 508, 512 (Tex. App.—Fort Worth 2014, no pet.) ("Trespass to real property requires a showing of an unauthorized physical entry onto the plaintiff's property by some person or thing.").

Relying upon a number of provisions contained in the Plat and the Declaration, the City responds that the Joint Venture did not intend to convey the R2 lots to the HOA through the Declaration.  Therefore, according to the City, the Joint Venture's deeds legally transferred the R2 lots to the Foundation, which later transferred them to the Park Corporation, which owns them today.

Aside from several other arguments raised by the City, all of which we will address, the primary dispute between the parties thus centers on whether the Joint Venture intended to convey the R2 lots to the HOA by dedication in the Declaration.  The City asserts several compelling arguments, but we ultimately agree with Appellants that a proper application of the relevant rules of construction establishes that the Declaration conveyed the R2 lots to the HOA.

### 1. Standing

Directing us to Declaration section 10.02, the City argues that Appellants lack standing to challenge the HOA Board's Declaration-derived determination that it does not own the R2 lots.  Section 10.02 states in relevant part,

> The Board shall have the right, power and authority to determine all questions arising under or in connection with this Declaration and to

---

[3]By pleading a cause of action for trespass, Appellants satisfied the first requirement for temporary injunctive relief.  *See Butnaru*, 84 S.W.3d at 204.

construe and interpret the provisions thereof, and any determination, construction or interpretation made by the Board, in the absence of an adjudication by a court of competent jurisdiction that any such action was an abuse of discretion, shall be binding on the Owners.

According to the City, Appellants "manifestly do not have the right to interpret the provisions of the Declaration, and that is precisely what they are attempting to do by this action."

Directing us to Declaration section 10.04, Appellants respond that they have standing to seek injunctive relief both in contract and by law. Regarding the former, section 10.04 states in relevant part,

Declarant, the [HOA], and *the Owners shall have the right, but not the obligation, to enforce the covenants and restrictions set out in this Declaration.* Enforcement may be made by any proceedings at law or in equity against any Person violating or attempting to violate any part of this Declaration, as such may be amended or modified, to restrain or enjoin violations thereof, to recover damages, or to seek such other relief available pursuant to applicable law. Damages shall not be deemed adequate compensation for any breach or violation of any provision of this Declaration, and Declarant, the [HOA], and *each Owner . . . shall be entitled to relief by way of injunction, as well as any other remedy either at law or in equity*. [Emphasis added.]

Appellants are proceeding within the terms of the Declaration. Section 10.02 certainly gives the HOA the authority to interpret the Declaration, but the HOA's interpretation is only binding "in the absence of final adjudication by a court of competent jurisdiction" that concludes otherwise. Section 10.02 thus contemplates (i) a scenario in which a homeowner's interpretation of the Declaration is at odds with the HOA's interpretation of the Declaration and (ii) that homeowner-initiated litigation successfully challenging the HOA's

10

interpretation of the Declaration will avoid the binding effect thereof. Section 10.04, which is located in the very same article as section 10.02, expressly gives a homeowner the right alluded to by section 10.02—the right to enforce the provisions of the Declaration, which action may or may not involve challenging an HOA interpretation of the Declaration.

Here, Appellants sued the City in a court of competent jurisdiction, and each of their trespass, suit to quiet title, trespass to quiet title, declaratory judgment, and inverse condemnation claims challenge or implicate the HOA's interpretation of the Declaration that the HOA does not own the R2 lots. By pursuing such relief, Appellants are in effect seeking—even if indirectly—an adjudication that the HOA's interpretation of the Declaration that the HOA does not own the R2 lots is erroneous. Further, nothing in either section 10.02 or section 10.04, or in Article X, conditions Appellants' ability to file suit and seek this temporary injunctive relief upon only a *prior* adjudication of the HOA's Declaration interpretation. Giving effect to all of section 10.02, reconciling it with section 10.04, and considering the nature of, and the relief sought by, Appellants' claims, section 10.02 is no impediment to Appellants' application for temporary injunctive relief. *See J.M. Davidson*, 128 S.W.3d at 229 (reasoning that when construing written agreement, no single provision taken alone will be given controlling effect and that all provisions must be considered with reference to whole instrument).

11

## 2. Public Recreation Use

The City next argues that the Joint Venture could not have intended to convey the R2 lots to the HOA because the Joint Venture's "clear and express intent was to exclude the R2 lots from the Declaration, and instead to designate them for 'public recreation use.'" As support, the City observes that "the Declaration by its express terms affects only 'the Property'" and that the R2 lots were excluded from the Declaration's definition of that term.[4] The City improperly blurs the careful distinction that the Declaration intentionally draws between the Property and the Common Properties. The definition of Property excludes the R2 lots, but it also does not include the Common Properties. The Declaration provides a separate, specific, and detailed definition of Common Properties, which includes the streets, any guardhouses, the entry areas, the improvements installed by the HOA, and the following:

> Any and all greenbelt areas, bicycle and/or jogging paths, landscape easements, floodways, creeks, drainage ways, open spaces, pedestrian access easement or other similar areas as shown on the Plat (as hereinafter defined) of the Subdivision, whether within or surrounding or along the boundaries of *the Property* . . . . [Emphasis added.]

This distinct definition demonstrates that the Joint Venture intended to differentiate and segregate the Common Properties from the Property. Therefore, if the Declaration *included* the R2 lots in the Common Properties, as

---

[4]The Declaration states that "'Property' shall mean the real property situated in the City of Mansfield, Tarrant County, Texas, more particularly described on Exhibit 'A' attached hereto." The description includes the R1 lots (and several other numbered lots) but not the R2 lots.

12

Appellants argue, then it follows that the Joint Venture purposefully *excluded* them from the definition of Property. Construing the Declaration as a whole, the R2 lots' exclusion from the definition of Property merely expresses the Joint Venture's intent to do just that—exclude the R2 lots from the definition of Property, not from the entire Declaration.

The City next directs us to the Plat's first Condition of Approval, which states that the R2 lots "are inten[d]ed for public recreation use and shall not be converted to other uses. No building permits will be issued for any of said lots unless it is for construction related to public recreation use." The City contends that "[t]his restriction is directly contrary to the [Appellants'] suggestion that the [Joint Venture's] intent was to allow only private use of the R2 lots by the homeowners." The City also argues that the Joint Venture "was no longer free to convey the R2 lots to the HOA" once it filed the Plat containing the first Condition of Approval because the Plat "set aside [the R2 lots] for the public's use." The former argument overlooks a crucial distinction; the latter misconstrues the Plat's first Condition. Appellants do not argue that the R2 lots were intended for private use; they argue that the Joint Venture conveyed the R2 lots to the HOA by dedication in the Declaration. As for the Plat's first Condition, it does not prohibit *conveyance* of the R2 lots; it prohibits their *development* for nonrecreational uses. The Joint Venture's intent as expressed in the Plat's first Condition is not compromised by a mere conveyance of the R2 lots to the HOA. Further, there is nothing in the Declaration that somehow associates a conveyance of the R2 lots

13

to the HOA with a Plat-prohibited development of the R2 lots for nonrecreational purposes.

As further evidence that the Joint Venture did not intend to convey the R2 lots to the HOA, or to demonstrate the Joint Venture's intent to set aside the R2 lots for public recreation use, the City asserts that there is no mention in either the Declaration or the Plat of the HOA having any maintenance responsibility for the R2 lots. However, Declaration section 9.04 unambiguously imposes the responsibility to maintain the Common Properties upon the HOA. Appellants argue that the Common Properties include the R2 lots, and we conclude below that they do, so section 9.04 is sufficient to account for the R2 lots' maintenance.[5]

### 3. Declaration's Conveyance of Common Properties to HOA

For the HOA to own the R2 lots, the Declaration must have conveyed the Common Properties to the HOA. Appellants argue that the Declaration did so. The City argues that the Declaration did not do so. Declaration section 5.01 states as follows:

> 5.01 <u>Title to the Common Properties.</u> *The [HOA] will hold record fee simple title to the Streets and all other Common Properties, and all portions of the Property which are not within any of the Lots as shown on the Plat, all of which have been or will be dedicated to the*

---

[5]The City directs us to a recital located at the outset of the Declaration, but we see no reason to overlook section 9.02 in favor of the recital because section 9.04 addresses the Common Properties' maintenance and because we can reconcile the Plat's first Condition with a conveyance of the R2 lots to the HOA, as explained above. *See City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 722 (Tex. App.—Fort Worth 2008, pet. dism'd) (explaining that recitals in a contract do not control the operative clauses of a contract unless the latter are ambiguous).

> *[HOA] as shown on and pursuant to, the Plat*, subject to the easements set forth in this <u>Article</u> and in <u>Article</u> <u>VIII</u> hereof. Declarant or the [HOA] shall have the right to execute any open space declarations applicable to the Common Properties owned by, or dedicated to, the [HOA] which may be permitted by law in order to reduce property taxes. [Emphasis added.]

Appellants argue that the Declaration intended section 5.01 to affect a present transfer of the Common Properties. The City argues that the Joint Venture did not intend section 5.01 as a present conveyance because "will hold" indicates a future tense and "have been or will be" are terms signifying either past or future actions. According to the City, "any conveyance to the HOA was to occur before or after the filing of the Declaration, not by the Declaration." The City's construction is faulty.

We agree with Appellants that "the word 'will' does not always refer to a future event; it is an ordinary word of promise that may be used to create a contractual obligation." *See* Webster's Third New Int'l Dictionary 2616 (2002). Thus, whether the Joint Venture intended "will hold" to refer to a future event depends on how, and in what context, the term is used. *See Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003) (reasoning that contract provisions should be read in context, not in isolation). The City argues that the latter part of section 5.01's first sentence—"will be dedicated to the [HOA]"—demonstrates that "will hold" means a future event, but that argument is itself predicated upon a defective reading of section 5.01. Specifically, the City construes section 5.01 as providing that "[t]he [HOA] will hold record fee simple title to the Streets and all other Common Properties, . . . all of which have been

or will be dedicated to the [HOA] as shown on and pursuant to, the Plat."  But section 5.01 is more properly read as providing that the HOA will hold fee simple title to (1) the Streets, (2) the Common Properties, and (3) "all portions of the Property which are not within any of the Lots as shown on the Plat, all of which have been or will be dedicated to the [HOA] as shown on and pursuant to, the Plat."  *See Samano v. Sun Oil Co.*, 621 S.W.2d 580, 581–82 (Tex. 1981) (stating that "modifiers are intended to refer to the words closest to them in the sentence"); *see also Lockhart v. United States*, 136 S. Ct. 958, 962–63 (2016) (explaining that last antecedent rule has been applied for many years).  The last antecedent rule "can be overcome by indicia of other meaning," but this construction is supported by several other sections in the Declaration.  *See Mikob Props., Inc. v. Joachim*, 468 S.W.3d 587, 596 (Tex. App.—Dallas 2015, pet. denied).

Section 6.01(q) provides that the HOA's Board shall have the exclusive right, power, and duty "[t]o own fee simple title, or an easement interest, in the Common Properties."  Section 6.01(q) thus gives the HOA the express authority to own the Common Properties, and section 5.01 simultaneously carried out the Declaration's conveyance.

Declaration section 4.10 gives the City the right to assume the HOA's obligation to maintain the Common Properties if the HOA dissolves *and* the Common Properties are not either "dedicated to and accepted by an appropriate municipal corporation, public agency, authority or utility" or "conveyed to another

16

organization or entity which assumes all obligations imposed hereunder upon the" HOA. Thus, the HOA's dissolution is a predicate occurrence for either a dedication or a conveyance of the Common Properties.

Further, section 6.01(k) gives the HOA's Board the power to "protect or defend the Common Properties from loss or damage by suit or otherwise"; section 6.01(*l*) gives the HOA's Board the power to "make reasonable rules and regulations for the operation and use of the Common Properties"; section 4.02 requires homeowners to pay assessments to the HOA for the improvement and maintenance of the Common Properties; and section 9.04 imposes upon the HOA the responsibility to maintain the Common Properties, something the HOA has done in part for years. While none of these provisions considered in isolation are determinative, when considered together, they are indicative of the Joint Venture's intent to convey the Common Properties to the HOA.[6]

The City alternatively argues that the terms "as shown on and pursuant to, the Plat" "clearly indicate that the Plat, not the Declaration, was intended as a conveyance." According to the City, "[n]o conveyance by the [Joint Venture] of the private streets and private easements, whether by deed or through the

_____

[6]Arguing that section 5.01 is "erroneous," the City contends that the phrase "all portions of the Property which are not within any of the Lots as shown on the Plat" is surplusage because no portion of the Property lies outside of the lots. In a related argument, regarding the phrase "have been or will be dedicated to the [HOA] as shown on and pursuant to, the Plat," the City contends that nothing could "have been" dedicated to the HOA because the HOA did not exist when the Plat and Declaration were each filed. Both of these arguments are unpersuasive in light of our application of the last antecedent rule to the construction of section 5.01. As for the City's "didn't exist" argument, we address that below.

17

Declaration, was necessary because the private streets and easements had already been conveyed through the Plat." However, as explained immediately above, the terms "as shown on and pursuant to, the Plat" modify "all portions of the Property which are not within any of the Lots as shown on the Plat," not the Common Properties. Moreover, it cannot be ignored that the Joint Venture separately identified the Common Properties and "all portions of the Property which are not within any of the Lots as shown on the Plat," purportedly indicating that they are not identical forms of property. Thus, there is no conflict in construing the Declaration to convey the Common Properties but reading the Plat to convey "all portions of the Property which are not within any of the Lots as shown on the Plat."

Finally, referencing the Plat, the City argues that "rather than dedicating or conveying fee title to the private common property, the [Joint Venture] conveyed easement interests only." If this is an accurate interpretation of the Plat, then it supports Appellants' argument that the Declaration was free to convey fee title to the R2 lots to the HOA.

We conclude that the Joint Venture intended to convey the Common Properties to the HOA by dedication in the Declaration.

### 4. R2 Lots Included in Definition of Common Properties

The City next argues that even if the Declaration conveyed the Common Properties to the HOA, the Common Properties do not include the R2 lots. However, as set out above, subparagraph (k)(ii) of Article I of the Declaration

defines Common Properties to mean, in part, all "*greenbelt areas*, *bicycle and/or jogging paths*, landscape easements, *floodways*, creeks, drainage ways, *open spaces*, pedestrian access easement *or other similar areas* as shown on the Plat . . . , whether within *or surrounding or along the boundaries of the Property*." [Emphasis added.]   Michael Goodrich testified at the hearing on Appellants' amended application, and the record reflects, that several items included in the definition—the greenbelt areas, bicycle and jogging paths, and floodways—correspond to areas that are located within, or that entirely encompass, the R2 lots.  Indeed, the jogging path is located in the R2 lots, the floodways completely encompass the R2 lots, and Walnut Creek and its trees and grass border Creekwood's northern and western boundaries.  Moreover, the R2 lots—which are undeveloped, open spaces—surround or run along the boundaries of the Property.[7]  Goodrich consequently opined, and we agree, that these numerous items contained in the definition of Common Properties are not boilerplate but were "clearly tailored" for this particular development.

The City acknowledges that the definition of Common Properties "arguably could include portions of the R2 lots," but it nevertheless contends that the Joint Venture did not intend to include the R2 lots in the definition of Common

---

[7]The City argues that this language—"within or surrounding or along the boundaries of the Property"—"could easily have been either intended to simply cover any strips and gores that were excluded, or perhaps it was inadvertently held over from a prior draft of the Declaration before the R2 lots were carved out of the R1 lots."   This argument is based on speculation, not the language contained in the Declaration.

19

Properties because the R2 lots are excluded from the terms "Property" and "Subdivision."[8]  This is a slight variation of the same unpersuasive argument above.  For the same reasons, the R2 lots' exclusion from the terms "Property" and "Subdivision" does not evidence the Joint Venture's intent to exclude the R2 lots from the meaning of Common Properties.

The City also directs us to the definitions of "Lot" or "Lots" and "Total Lots," all of which expressly exclude from their meaning any lots "shown on the Plat as intended for public recreation or public park purposes," and argues that this demonstrates the Joint Venture's intent to limit the scope of the Declaration because the Plat's first Condition designated the R2 lots for public recreation use.  Once again, the Plat's first Condition prohibits the R2 lots' development for nonrecreational use; it does not prohibit the R2 lots from being conveyed to the HOA, nor is the Declaration incompatible with a conveyance of the R2 lots to the HOA.[9]

In a related argument, the City asserts that the Plat's first Condition designating the R2 lots for public recreation use, which is specific, controls over the Declaration's definition of Common Properties, which is more general.  The

---

[8]The Declaration defines "Subdivision" as "the Property as shown on the Plat, to be commonly known as 'The Arbors of Creekwood – Gated Community.'"

[9]The City observes a potential conflict between the boundaries of the R1 residential lots, which partially lie within the floodways, and the definition of Common Properties, which expressly includes the floodways.  If this is a conflict between the Plat and the Declaration, it did not arise as a result of this litigation, and our court has no ability, authority, or responsibility to rewrite the terms of the documents.

rule of contract construction that the City seeks to apply is inapposite because, as explained, the Plat's first Condition of Approval does not conflict with the definition of Common Properties.  *See Sefzik v. Mady Dev., L.P.*, 231 S.W.3d 456, 462 (Tex. App.—Dallas 2007, no pet.) (stating that specific-controls-over-general rule applies when contract provisions conflict).

We agree with Appellants that the R2 lots are included within the definition of Common Properties.

### 5.    Existence of the HOA

Relying on the rule that "a deed is void if the grantee is not in existence at the time the deed is executed," *Parham Family Ltd. P'ship v. Morgan*, 434 S.W.3d 774, 787 (Tex. App.—Houston [14th Dist.] 2014, no pet.), the City argues, and the dissent agrees, that the Declaration could not have conveyed the R2 lots to the HOA because the HOA "didn't exist at the time the Declaration was filed."[10]  The rule is certainly worded broadly, but it has never been applied to facts that are anything like those in this case, as the caselaw cited by the City reflects.

In *Parham*, the grantee-entity never existed.  *Id.* at 777, 787.  In *Lighthouse Church of Cloverleaf v. Texas Bank*, the grantee had a statutory right to reinstate its corporate charter after it had been forfeited.  889 S.W.2d 595,

---

[10]Insofar as the City argues that the R2 lots could not have been conveyed because the HOA had not been formed when *the Plat* was filed, this is of no consequence because Appellants argue that the Declaration conveyed the R2 lots to the HOA, not the Plat.

21

599–601 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (op. on reh'g).  In *William Cameron & Co. v. Truehart*, the deed conveyed land to individuals, not to a yet-to-be-created entity.  165 S.W. 58, 61 (Tex. Civ. App.—Austin 1914, no writ).  And in *Sparks v. Humble Oil & Refining Co.*, a deed evidenced a legal conveyance even though it was signed and acknowledged by one of the grantors after the grantee's death.  129 S.W.2d 468, 471–72 (Tex. Civ. App.—Texarkana 1939, writ ref'd).  Moreover, at least one state's high court has reasoned that "[a] deed to a corporation made prior to its organization, is valid between the parties." *John Davis & Co. v. Cedar Glen # Four, Inc.*, 450 P.2d 166, 170 (Wash. 1969).

In this case, the Joint Venture executed the Declaration on December 6, 1995, the very same day that the incorporator created the document pursuant to which the HOA's Articles of Incorporation were drafted.  The Declaration became effective upon its filing on December 11, 1995, just one day before the Articles of Incorporation were executed and four days before they were filed.  Robert McCaslin signed the Declaration as Managing Partner of the Joint Venture, and the Articles of Incorporation identify him as the lone initial member of the HOA's Board.  The HOA's Articles of Incorporation were filed before the Joint Venture executed the deed to the Foundation.

As the record shows, this is not a case in which the HOA's Articles of Incorporation were filed weeks, months, or years after the Declaration was filed, or were not even filed at all.  The record plainly demonstrates that all of these events occurred contemporaneously and involved the same individuals.  By

22

treating the HOA as a nonexistent entity that was incapable of owning the R2 lots, the City and the dissent ignore the realities associated with the complicated process of formalizing a development and improperly seek to resolve this challenging case upon a hypertechnical reading of the grantee-existence rule. We will not do so.[11]

### 6. Statute of Frauds

The City alternatively argues that even if Declaration section 5.01 was intended as a present conveyance of the R2 lots, it violates the statute of frauds because the definition of Common Properties contained in subparagraph (k)(ii) of Article I and set out above "is too vague to identify the property described."

An instrument that conveys land must contain a sufficient legal description, or it is void under the statute of frauds. *Greer v. Greer*, 144 Tex. 528, 530, 191 S.W.2d 848, 849 (1946). "A property description is sufficient if the writing furnishes within itself, or by reference to some other existing writing, the means or data by which the particular land to be conveyed may be identified with reasonable certainty." *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008). In other words, "[i]f enough appears in the description so that a party familiar with

---

[11]The City also argues that the HOA could not own the R2 lots because the HOA's Articles of Incorporation "do not express any intent that the [HOA] actually own any real property." However, the Articles of Incorporation provide that the purpose for organizing the HOA is "[t]o define and enforce the Deed Restrictions of [Creekwood] *and carry out the duties authorized therein.*" [Emphasis added.] The Declaration expressly gives the HOA the right, power, and duty to own fee simple title in the Common Properties. The HOA's ownership of the R2 lots is therefore consistent with the purpose of the Articles of Incorporation.

the locality can identify the premises with reasonable certainty, it will be sufficient." *Gates v. Asher*, 154 Tex. 538, 541, 280 S.W.2d 247, 248–49 (1955). The writing does not have to list metes and bounds to be enforceable. *Nguyen v. Yovan*, 317 S.W.3d 261, 267 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Extrinsic evidence may be used "only for the purpose of identifying [the property] with reasonable certainty from the data" contained in the conveying instrument, "not for the purpose of supplying the location or description" of the property. *Morrow v. Shotwell*, 477 S.W.2d 538, 541 (Tex. 1972).

The City argues that the definition of Common Properties is not sufficiently specific because it does not identify the R2 lots "by tract survey and county" or contain information regarding their "size, shape, and boundaries." The test for sufficient specificity does not require mathematical certainty. *See Gates*, 154 Tex. at 542, 280 S.W.2d at 249. Although certain cases may require a survey and county identification, this is not one of them. As explained above, several items included in the definition of Common Properties correspond to, and specifically identify, areas that are actually located within, or that entirely encompass, the R2 lots. The language is not merely boilerplate, and there is no dispute that the language references property that is contained within Creekwood.

The City contends that the phrase "as shown on the Plat . . . of the Subdivision" is of no help because the Plat does not show the location of the greenbelt areas or jogging paths. But the Plat identifies Walnut Creek's location

24

and the floodways, and according to Goodrich, considering Declaration subparagraph (k)(ii) of Article I and the Plat, and having seen the property, "all those taken together, you can identify [the greenbelt areas] clearly." Moreover, in *Templeton v. Dreiss*, the court of appeals explained,

> [W]here a map, plat, plan or survey of the premises conveyed is adequately referred to [in the] deed, it is usually to be considered as a part of the latter instrument and construed in connection therewith and the courses, distances, or other particulars which appear on such map, plat, plan or survey, are as a general rule to be considered as the true, or part of the true, description of the land conveyed.

961 S.W.2d 645, 660 (Tex. App.—San Antonio 1998, pet. denied) (*citing Pritchard v. Burnside*, 140 Tex. 212, 167 S.W.2d 159, 162 (1943)). If this authority is still relevant to this inquiry, the Plat clearly identifies the R2 lots.

The City also argues that the definition of Common Properties references a plat that is incapable of being identified because "Plat" is defined by the Declaration to mean "the final plats of The Arbors of Creekwood – Gated Community," but there is no plat on file in Tarrant County that is designated as a plat of "The Arbors of Creekwood – Gated Community." Both parties repeatedly cite to and rely upon the same plat that was entered into evidence at the hearing on Appellants' amended application for a temporary injunction—the one identified as "Plat Revision, Lots 52-R1, through . . . 71-R2, Arbors of Creekwood Phase Two and Five." Referencing that plat, at the hearing on Appellant's application, the City acknowledged during its closing argument that "[w]e all believe we have the correct plat in front of us." Although the Declaration's definition of "Plat"

25

references an incorrect plat, the definition of "Property," which is described in Exhibit A to the Declaration, references the "Arbors of Creekwood Phase Two and Five" plat. Liberally construing the Declaration to give effect to its purpose and intent, as we must, we conclude that the Declaration properly refers to the plat that is referenced in the definition of "Property." *See Leake v. Campbell*, 352 S.W.3d 180, 184 (Tex. App.—Fort Worth 2011, no pet.).

We conclude that the Declaration describes the Common Properties with reasonable certainty. *See Gates*, 154 Tex. at 541, 280 S.W.2d at 248–49.

### 7. Ambiguity

In the City's final alternative argument, it contends that "[i]f there is any question as to whether the Declaration was intended as a conveyance, the provisions of the Declaration are ambiguous because the language is subject to two or more interpretations."

If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (op. on reh'g). A contract is not ambiguous simply because the parties disagree over its meaning. *Dynegy Midstream Svcs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009).

In light of all of the above, we determine that the Joint Venture unambiguously intended to convey the R2 lots to the HOA by dedication in the Declaration. We therefore decline to consider the City's extrinsic evidence for

26

purposes of determining whether the Joint Venture intended such a conveyance. *See R&P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1980) ("If after applying the established rules of interpretation, a written instrument remains reasonably susceptible to more than one meaning, extraneous evidence is admissible to determine the true meaning of the instrument.").

Having determined that the Joint Venture intended to convey the R2 lots to the HOA through a dedication in the Declaration, and because the effective date of the Declaration preceded the Joint Venture's deed to the Foundation, we conclude and hold that Appellants established a probable right to relief on their trespass claim. *See Oil Field Haulers Ass'n*, 381 S.W.2d at 196; *Frequent Flyer Depot*, 281 S.W.3d at 220. We therefore sustain the first part of Appellants' issue and do not address whether they additionally showed a probable right to relief on their claim against the City from breach of the Declaration's restrictive covenants. *See* Tex. R. App. P. 47.1.

### D. Probable Injury

In the other part of their only issue, Appellants argue that they met their burden to show that a probable, irreparable injury will result before trial absent a temporary injunction. Probable injury includes the elements of imminent harm, irreparable injury, and no adequate remedy at law. *Shor v. Pelican Oil & Gas Mgmt., LLC*, 405 S.W.3d 737, 750 (Tex. App.—Houston [1st Dist.] 2013, no pet.). An injury is irreparable if the injured party cannot be adequately compensated in

damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204.

Appellants pleaded that the Park Corporation, in conjunction with the City, constructed and affixed a permanent structure on property that it does not own—the R2 lots. The City argues that damages would be sufficient to redress Appellants' alleged injury for trespass, but this ignores the very reason why Appellants initiated this lawsuit. The evidence at the hearing on Appellants' amended application demonstrates that the construction and opening of the bridge has led to a dramatic increase in the number of people accessing the R2 lots on both weekdays and weekends, destroying Appellants' sense of privacy. Where a trespass invades the possession of a person's land, or destroys the use and enjoyment of the land, an injunction is a proper remedy. *Beathard Joint Venture v. W. Houston Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App.—Texarkana 2002, no pet.); *see Yarto v. Gilliland*, 287 S.W.3d 83, 97 (Tex. App.—Corpus Christi 2009, no pet.) (holding that the potential loss of rights in real property is a probable, imminent, and irreparable injury that qualifies a party for a temporary injunction); *Rus-Ann Dev., Inc. v. ECGC, Inc.*, 222 S.W.3d 921, 927 (Tex. App.—Tyler 2007, no pet.) (same); *see also Seghers v. Kormanik*, No. 03-13-00104-CV, 2013 WL 3336845, at *5 (Tex. App.—Austin June 26, 2013, no pet.) (mem. op.) (same).

The City argues, and the dissent agrees, that Appellants must be seeking mandatory injunctive relief—and were therefore required to demonstrate extreme

necessity or hardship—because they asked that a temporary barricade be placed on the bridge and that a "no trespassing" sign be placed on the barricade. *See Tri-Star Petroleum Co. v. Tipperary Corp.*, 101 S.W.3d 583, 592 (Tex. App.—El Paso 2003, pet. denied) (reasoning that mandatory injunction requires showing of "a clear and compelling presentation of extreme necessity or hardship"). But Appellants also requested that the trial court enjoin the City from permitting the public, or encouraging others, to enter the R2 lots by crossing over the bridge. Appellants' requested injunctive relief thus contains elements of *both* a mandatory and prohibitive character. When identifying the type of injunction sought under these unique circumstances, a court should resort to the pleadings and examine the nature of the applicant's underlying claims to determine which element of injunctive relief is merely incidental to the primary relief sought. *See id.* at 592–93.

Appellants sued the City because it built a bridge onto property that is allegedly owned by a different entity, leading to a sharp increase in the number of nonresidents who utilize the R2 lots for recreation, leading to a decrease in Appellants' privacy and safety. These are the primary motivating factors in Appellants' decision to pursue this litigation. There can be no doubt, therefore, that the primary injunctive relief sought by Appellants is to prohibit the City from permitting the public, or encouraging others, to enter the R2 lots by crossing over the bridge. Sure, placing a barricade and sign are mandatory-type requests, but they are merely incidental to Appellants' primary relief because without them,

nothing would notify the public that crossing over the bridge and onto the R2 lots is prohibited, thus rendering the primary, prohibitive injunctive relief unenforceable, meaningless, or both. Appellants sought a prohibitive temporary injunction and were not required to demonstrate extreme hardship or necessity.

We hold that Appellants met their burden to show that a probable, irreparable injury will result before trial absent a temporary injunction. Accordingly, we sustain the remainder of Appellants' only issue, and we hold that the trial court abused its discretion by denying Appellants' amended application for a temporary injunction.

## IV. CONCLUSION

Having sustained Appellants' sole issue, we reverse the trial court's order denying Appellants' amended application for a temporary injunction and remand this cause to the trial court for further proceedings consistent with this opinion. *See Sonwalker v. St. Lukes Sugar Land P'Ship, L.L.P.*, 394 S.W.3d 186, 203 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (reversing trial court order denying application for temporary injunction and remanding case to trial court for further proceedings consistent with opinion); *see also* Tex. R. Civ. P. 683, 684. We lift the stay that was ordered on September 21, 2016, and clarified on September 22, 2016.

/s/ Bill Meier
BILL MEIER
JUSTICE

30

EN BANC

SUDDERTH, J., filed a dissenting opinion in which DAUPHINOT and GARDNER, JJ., join.

DELIVERED:  September 29, 2016