# IN THE SUPREME COURT OF TEXAS

════════════

No. 14-0753

════════════

U.S. METALS, INCORPORATED, APPELLANT

v.

LIBERTY MUTUAL GROUP, INCORPORATED, DOING BUSINESS AS
LIBERTY INSURANCE CORPORATION, APPELLEE

═══════════════════════════════════════════════════

ON CERTIFIED QUESTIONS FROM THE UNITED STATES
COURT OF APPEALS FOR THE FIFTH CIRCUIT

═══════════════════════════════════════════════════

**Argued September 2, 2015**

CHIEF JUSTICE HECHT delivered the opinion of the Court.

The insured under a standard-form commercial general liability insurance policy supplied flanges for use in constructing refinery processing units. The flanges leaked and had to be replaced to avoid the risk of fire or explosion. The flanges were welded to the pipes they joined and therefore had to be cut out while the refineries were shut down. The insured claims that its liability for the refinery owner's replacement costs and downtime damages are covered by its CGL policy.

The policy covers "physical injury" to property and the lost use of property that could not be restored by replacing the flanges. Four questions certified to us by the United States Court of Appeals for the Fifth Circuit[1] raise two issues. One is whether property is physically injured merely

---

[1] 589 F. App'x 659, 663–664 (5th Cir. 2014) (mem. op.).

by installing a defective product into it. This is an issue over which American jurisdictions have differed and one which we have not had occasion to consider. The other issue is whether replacing the flanges restored the refinery property to use when some of the property was destroyed in the process. We conclude that the policy does not cover most of the damages claimed and answer the Circuit's questions accordingly.

## I

U.S. Metals, Inc. sold ExxonMobil Corp. some 350 custom-made, stainless steel, weld-neck flanges for use in constructing nonroad diesel units at its refineries in Baytown, Texas, and Baton Rouge, Louisiana. The units remove sulfur from diesel fuel and operate under extremely high temperatures and pressures. ExxonMobil contracted for flanges made to meet industry standards and designed to be welded to the piping. The pipes and flanges, after they were welded together, were covered with a special high temperature coating and insulation.

In post-installation testing, several flanges leaked. Further investigation revealed that the flanges did not meet industry standards, and ExxonMobil decided it was necessary to replace them to avoid the risk of fire and explosion. For each flange, this process involved stripping the temperature coating and insulation (which were destroyed in the process), cutting the flange out of the pipe, removing the gaskets (which were also destroyed in the process), grinding the pipe surfaces smooth for re-welding, replacing the flange and gaskets, welding the new flange to the pipes, and replacing the temperature coating and insulation. The replacement process delayed operation of the diesel units at both refineries for several weeks.

ExxonMobil sued U.S. Metals for $6,345,824 as the cost of replacing the flanges and $16,656,000 as damages for the lost use of the diesel units during the process. U.S. Metals settled with ExxonMobil for $2.2 million and then claimed indemnification from its commercial general liability insurer, Liberty Mutual Group, Inc., for the amount paid.

The convoluted provisions of the standard-form CGL policy:

- obligate Liberty Mutual to "pay those sums that [U.S. Metals] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies";

- define "property damage" to mean "[p]hysical injury to tangible property, including all resulting loss of use of that property", and "[l]oss of use of tangible property that is not physically injured";

- exclude, in subparagraph K, "'property damage' to 'your product' arising out of it or any part of it";

- exclude, in subparagraph M, "'[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of . . . [a] defect, deficiency, inadequacy or dangerous condition in 'your product'";

- define "your product" to mean "[a]ny goods or products . . . sold . . . by [U.S. Metals]"; and

- define "impaired property" to mean:

> tangible property, other than "your product" . . . , that cannot be used or is less useful because:
>
> a.    It incorporates "your product" . . . that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b.    You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by the repair, replacement, adjustment or removal of "your product" . . . or your fulfilling the terms of the contract or agreement.

All damages for which U.S. Metals claims coverage arose out of its defective flanges, and thus Exclusions K and M apply. Under Exclusion K, damages to the flanges themselves are not covered, and U.S. Metals does not claim them. Under Exclusion M, the policy does not cover damages to property, or for the loss of its use, if the property was not physically injured or if it was restored to use by replacement of the flanges. The existence and extent of coverage thus depends on whether ExxonMobil's property was (1) physically injured or (2) restored to use by replacing the flanges. U.S. Metals contends that ExxonMobil's property was physically injured both by the mere installation of the faulty flanges and also later, during the replacement process. U.S. Metals further contends that the diesel units could not be restored to use simply by replacing the flanges because welds, gaskets, insulation, and coating were destroyed in the process and had to be replaced as well.

Liberty Mutual denied coverage, and U.S. Metals sued in federal district court to determine its right to a defense and indemnity under the policy. The court granted summary judgment for Liberty Mutual. On appeal, the Fifth Circuit certified to this Court the following four questions inquiring about the meaning of "physical injury" and "replacement" in the CGL policy and their application in this situation:

1.  In the "your product" and "impaired property" exclusions, are the terms "physical injury" and/or "replacement" ambiguous?

2.  If yes as to either, are the aforementioned interpretations offered by the insured reasonable and thus, must be applied pursuant to Texas law?

3. If the above question 1 is answered in the negative as to "physical injury," does "physical injury" occur to the third party's product that is irreversibly attached to the insured's product at the moment of incorporation of the insured's defective product or does "physical injury" only occur to the third party's product when there is an alteration in the color, shape, or appearance of the third party's product due to the insured's defective product that is irreversibly attached?

4. If the above question 1 is answered in the negative as to "replacement," does "replacement" of the insured's defective product irreversibly attached to a third party's product include the removal or destruction of the third party's product?[2]

As we will explain, the parties' dispute and the certified questions distill to two essential inquiries. First: did the mere installation of the faulty flanges physically injure the diesel units when the only harm at that point was the risk of leaks? Or put more generally: is property physically injured simply by the incorporation of a faulty component with no tangible manifestation of injury? And second: is property restored to use by replacing a faulty component when the property must be altered, damaged, and repaired in the process? We will address these issues in turn and then answer the certified questions.

## II

A few basic principles guide our analysis. The interpretation of an insurance policy, like other contracts, begins with the text,[3] and requires that undefined words be given their plain, ordinary, and

---

[2] 589 F. App'x 659, 663–664 (5th Cir. 2014) (mem. op.). As usual, the Fifth Circuit has "disclaim[ed] any intention or desire that [this Court] confine its reply to the precise form or scope of the questions certified." *Id.* at 664.

[3] *Glover v. Nat'l Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977) ("[T]he plain language of an insurance policy, like that of any other contract, will be given effect when the parties' intent may be discerned from that language.").

5

generally accepted meanings absent some indication of a different intent.[4] An interpretation that gives each word meaning is preferable to one that renders one surplusage.[5] And a policy provision is ambiguous only if it is subject to more than one reasonable interpretation[6] and not merely because the parties[7] or other courts[8] differ over its interpretation. With these basic principles in mind, we turn to the policy provisions at issue.

## A

The parties dispute whether the installation of the faulty flanges physically injured the diesel units within the meaning of the CGL policy. The policy covers "injury", which means "[t]he violation of another's legal right", or more generally, "[a]ny harm or damage."[9] But the policy does

---

[4] *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990) (undefined policy terms "should be given their plain, ordinary and generally accepted meanings"); *Ramsay v. Md. Am. Gen. Ins. Co.*, 533 S.W.2d 344, 346 (Tex. 1976) (same); *W. Reserve Life Ins. Co. v. Meadows*, 261 S.W.2d 554, 557 (Tex. 1953) (same).

[5] *Liberty Mut. Ins. Co. v. Am. Emp'rs Ins. Co.*, 556 S.W.2d 242, 245 (Tex. 1977) (cited in *Ewing Const. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 37 (Tex. 2014) ("[I]nterpretations of contracts as a whole are favored so that none of the language in them is rendered surplusage.")); *accord Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157, 159 (Tex. 2003); *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex. 1998).

[6] *Grain Dealers Mut. Ins. Co. v. McKee*, 943 S.W.2d 455, 458 (Tex. 1997) ("A contract is unambiguous as a matter of law if it can be given a definite or certain legal meaning. Conversely, if an insurance contract is subject to more than one reasonable interpretation, the contract is ambiguous and the interpretation that most favors coverage for the insured will be adopted." (citation omitted)).

[7] *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 119 (Tex. 2015) ("An ambiguity does not arise simply because the parties offer conflicting interpretations." (quoting *Schaefer*, 124 S.W.3d at 157)).

[8] *Grain Dealers*, 943 S.W.2d at 459 (rejecting argument that "policy provisions are ambiguous and susceptible to more than one reasonable interpretation merely because other jurisdictions have reached differing conclusions about similar policy provisions").

[9] BLACK'S LAW DICTIONARY 905 (10th ed. 2014); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1164 ("an act that damages, harms, or hurts : an unjust or undeserved infliction of suffering or harm : wrong[;] a violation of another's rights for which the law allows an action to recover damages or specific property or both : an actionable wrong[;] hurt, damage, or loss sustained").

not cover every injury; it covers only "physical injury". "Physical" means "[o]f, relating to, or involving material things; pertaining to real, tangible objects".[10]

A thing whose use or function is diminished by the incorporation of a faulty component can fairly be said to be injured, even if the injury is intangible, latent, or inchoate. Here, the installation of the leaky flanges—or at least potentially leaky, and in any event below-standard—can certainly be said to have injured—harmed or damaged—the diesel units by increasing the risk of danger from their operation and thus reducing their value. But if that increased risk amounted to *physical* injury within the meaning of the CGL policy, then it is difficult to imagine a non-physical injury. Any lessening of property by adding a component would be not only injury but physical injury. The policy's limitation of coverage to damages from physical injury necessarily implies that there can be non-physical, non-covered injuries. Otherwise, the requirement that injury be "physical" would be superfluous. To give "physical" its plain meaning, a covered injury must be one that is tangible.

The meaning of "physical injury" in a standard-form CGL policy has been thoroughly explored in two cases. The issue in both was whether a home was physically injured when the plumbing system was installed—the incorporation theory—or not until years later when it began to

---

[10] BLACK'S LAW DICTIONARY 1331 (10th ed. 2014); *see also* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1706 ("of or relating to natural or material things as opposed to things mental, moral, spiritual, or imaginary").

leak—the actual harm theory. In the first case, *Eljer Manufacturing, Inc. v. Liberty Mutual Insurance Co.* (*Eljer I*), a Seventh Circuit panel, applying Illinois law, acknowledged that

> [t]he central meaning of [physical injury] as it is used in everyday English—the image it would conjure up in the mind of a person unschooled in the subtleties of insurance law—is of a harmful change in appearance, shape, composition, or some other physical dimension of the "injured" person or thing. If water leaks from a pipe and discolors a carpet or rots a beam, that is physical injury, perhaps beginning with the very earliest sign of rot—the initial contamination . . . . The ticking time bomb, in contrast, does not injure the structure in which it is placed, in the sense of altering the structure in a harmful, or for that matter in any, way—until it explodes.[11]

But the panel majority rejected this theory, reasoning instead that because the purpose of insurance is to spread risks, and because the failure rate was sufficiently high to mark the product as defective and induce a rational owner to replace the plumbing system before it leaked, the inclusion of the system in a home was physical injury.[12] The majority's *Erie*-guess,[13] though less than firm, was that the Illinois Supreme Court would embrace the incorporation theory of physical injury for CGL policy coverage.[14]

---

[11] 972 F.2d 805, 808–809 (7th Cir. 1992).

[12] *Id.* at 809–812.

[13] *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

[14] 972 F.2d at 813–814.

The majority guessed wrong. Nine years later, in *Travelers Insurance Co. v. Eljer Manufacturing, Inc.* (*Eljer II*), the Illinois Supreme Court held that incorporating a defective component into something is not, in and of itself, "physical injury", even though there is "intangible damage, such as diminution in value".[15]

> [W]ithout a harmful change in appearance, shape, composition, or some other physical dimension to the claimants' property, the insurance coverage is not triggered. We believe that [*Eljer I*] erred when it set aside the central, plain, and ordinary meaning of the term physical injury . . . .[16]

Our case does not have the timing issue the *Eljer* cases had. Some of the plumbing systems in those cases did not leak for years after the systems were installed, whereas U.S. Metals' flanges leaked from the very start, in initial testing before they were even placed into service. But the salient point to be drawn from *Eljer II* is that physical injury, for purposes of the same CGL policy provision at issue here, resulted not from the installation but from the leak. Leaks from U.S. Metals' flanges never caused injury because ExxonMobil replaced them to avoid any risk of injury.

We count twelve state high courts that have considered whether to adopt the incorporation theory in interpreting "physical injury" in CGL policies. Of those, five have rejected the theory

---

[15] 757 N.E.2d 481, 496 (Ill. 2001).

[16] *Id.* at 497 (internal quotation marks and citation omitted).

expressly[17] and five implicitly.[18] Only two state high courts have followed the incorporation theory.[19]

Several other state and federal courts have rejected the incorporation theory.[20]

[17] *See U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 890 (Fla. 2007) (recognizing that the "mere inclusion of a defective component" is not property damage); *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 309–310 (Tenn. 2007) (same); *United Nat'l Ins. Co. v. Frontier Ins. Co.*, 99 P.3d 1153, 1158 (Nev. 2004) (determining that damage to a welded steel sign occurred at the time the sign collapsed in a windstorm, not at the time the sign was negligently attached to its frame); *Wyo. Sawmills, Inc. v. Transp. Ins. Co.*, 578 P.2d 1253, 1256 (Or. 1978) (rejecting the insured's argument that defective studs "became integrated into and were made a part of the building and their subsequent warping was damage to the building whether the damage was limited to the studs or not"); *see also Taylor Morrison Servs., Inc. v. HDI-Gerling Am. Ins. Co.*, 746 S.E.2d 587, 591 n.10 (Ga. 2013) (quoting the decision in *J.S.U.B.* approvingly but failing to reach the "property damage" issue).

[18] Five state high courts have implicitly rejected the incorporation theory by holding that property damage covered under a CGL does not include defective work or a defective component alone, but would include damage caused by that defective work or component to other property. *See Capstone Bldg. Corp v. Am. Motorists Ins. Co.*, 67 A.3d 961, 980–982 (Conn. 2013); *Crossmann Cmtys. of N.C. Inc. v. Harleysville Mut. Ins. Co.*, 717 S.E.2d 589, 594 (S.C. 2011); *Concord Gen. Mut. Ins. Co. v. Green & Co. Bldg. & Dev. Corp.*, 8 A.3d 24, 26–28 (N.H. 2010); *Vogel v. Russo*, 613 N.W.2d 177, 183–184 (Wis. 2000) (abrogated on other grounds); *cf. Mut. of Enumclaw Ins. Co. v. T & G Constr., Inc.*, 199 P.3d 376, 384 (Wash. 2008) (damage caused by the defective siding to the subsurface and interior walls, installed not by the insured but by others, was property damage covered by the policy; thus, removal and reinstallation of the siding to repair damage to the walls was within the scope of property damage).

[19] Citing *Eljer I*, the Wyoming Supreme Court noted, without further analysis, that "[i]t is well-recognized that the installation of a defect into a building is physical injury as defined in insurance policies." *Helm v. Bd. of Cty. Comm'rs,* 989 P.2d 1273, 1276 (Wyo. 1999). But *Helm* predates most of the contrary decisions, and the "defect" "installed" was actually the county's negligent inspection of a home. *Id.* at 1274. The Supreme Court of Montana adopted the incorporation theory for a case involving the application of defective paint to water pipes and tanks. *Swank Enters., Inc. v. All Purpose Servs., Ltd.*, 154 P.3d 52, 56 (Mont. 2007) (holding that "physical injury" for purposes of "property damage" under a commercial general liability insurance contract refers to a physical and material alteration resulting in a detriment). Note that the New York Court of Appeals, in applying incorporation theory in a limitations case, cited approvingly insurance coverage cases holding that injury-in-fact occurs when a defective component is integrated into a larger product, and that the trigger date for coverage was the date of installation of asbestos insulation. *See MRI Broadway Rental, Inc. v. U.S. Mineral Prods. Co.*, 704 N.E.2d 550, 553 (N.Y. 1998) (citing *Sturges Mfg. Co. v. Utica Mut. Ins. Co.*, 332 N.E.2d 319, 322 (N.Y. 1975) (explaining, in a case involving defective components in ski bindings, that "[w]hen one product is integrated into a larger entity, and the component product proves defective, the harm is considered harm to the entity to the extent that the market value of the entity is reduced in excess of the value of the defective component"), and *Md. Cas. Co. v. W. R. Grace & Co.*, 23 F.3d 617, 627 (2d Cir. 1993) ("holding that installation of asbestos is an occurrence of damage-in-fact and triggers the insurance coverage in effect at that time")); *see also Hoechst Celanese Corp. v. Certain Underwriters at Lloyd's London*, 673 A.2d 164, 169 (Del. 1996) (rejecting, as a matter of New York law, that "'property damage' occurs *only* at the time of a leak in the plumbing system, or when the homeowner decides to replace the system").

[20] In an analogous case, the Eighth Circuit concluded that the incorporation of defectively welded pipe sections into a larger piping structure was not physical injury: "there is no 'property damage' unless and until the incorporation of a defective product or component results in 'physical injury to tangible property' in at least some part of the system." *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 266 F.3d 859, 863 (8th Cir. 2001). In *New Hampshire Insurance Co. v. Viera*, 930

We agree with most courts to have considered the matter that the best reading of the standard-form CGL policy text is that physical injury requires tangible, manifest harm and does not result merely upon the installation of a defective component in a product or system. Our rejection of the incorporation theory is consistent with our other interpretations of CGL policies. We have held that faulty workmanship can be the basis of an "occurrence", though we noted that "faulty workmanship that merely diminishes the value of the home without causing physical injury or loss of use does not involve 'property damage.'"[21] We have further held that, for purposes of a duty to defend under an occurrence-based policy period, damage due to faulty workmanship "occurs" not at the time the damage manifests (when it is discovered or discoverable) nor when the plaintiff is exposed to the agent that will eventually cause the damage (when it is installed, presumably).[22] Rather, under a straightforward reading of the policy, we concluded that "[o]ccurred means when *damage* occurred, not when *discovery* occurred."[23] Since a defective product that causes damage is not an occurrence until the damage actually happens, it would be inconsistent to now find that a defective product that does *not* cause damage is nevertheless an occurrence at the time of incorporation.

F.2d 696 (9th Cir. 1991), the court concluded that the policy's 1973 addition of "physical" meant that mere diminution in value caused by the incorporation of the insured's defective products was not covered property damage under the post-1986 version of the policy. *Id.* at 700–701. Here in Texas, the First Court of Appeals held that there was no coverage for costs to repair defective welds where "the welds were never 'in an initial satisfactory state that was changed by some external event into an unsatisfactory state'" because they were defective to begin with. *N. Am. Shipbuilding, Inc. v. S. Marine & Aviation Underwriting, Inc.*, 930 S.W.2d 829, 834 (Tex. App.—Houston [1st Dist.] 1996, no writ) (quoting *Trinity Indus., Inc. v. Ins. Co. of N. Am.*, 916 F.2d 267, 270–271 (5th Cir. 1990)).

[21] *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 8–10 (Tex. 2007).

[22] *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 24–30 (Tex. 2008).

[23] *Id.* at 24, 30; *see also id.* at 24 ("we hold that property damage under this policy occurred when actual physical damage to the property occurred.").

The result in this case has a perverse aspect to it. Had ExxonMobil been negligent or reckless—had it not tested the flanges, or had it found the defect but decided to risk the danger of leaks—and an explosion had resulted, U.S. Metals would not be denied coverage for the damages to persons and property for want of physical injury. But because ExxonMobil was careful and cautious, U.S. Metals is not entitled to indemnity for the costs of remedying the installation of the faulty flanges. Nevertheless, we think the text of the policy is clear.

Several associations of contractors argue as amici curiae that the construction industry needs insurance to manage the risk that one contractor's work on a project will damage the entire project and other contractors, resulting in enormous repair costs and downtime.[24] Two insurer groups as amici curiae counter that it would be bad policy to allow contractors to insure against the quality of their own work.[25] This is a disagreement we cannot resolve. Our responsibility is to determine not what coverage should be available but what the CGL policy here provided.

We conclude that ExxonMobil's diesel units were not physically injured merely by the installation of U.S. Metals' faulty flanges.

**B**

But the units *were* physically injured in the process of replacing the faulty flanges. Because the flanges were welded to pipes rather than being screwed on, the faulty flanges had to be cut out,

---

[24] Brief of Amici Curiae Associated General Contractors of America, Texas Building Branch-Associated General Contractors of America, ABC of Texas, American Subcontractors Association, Inc., and ASA of Texas, Inc., in Support of Appellant U.S. Metals, Inc., at 10–11.

[25] Brief of Amici Curiae American Insurance Association and Property Casualty Insurers Association of America in Support of Defendant-Appellee, at 3–4.

12

pipe edges resurfaced, and new flanges welded in. The original welds, coating, insulation, and gaskets were destroyed in the process and had to be replaced. The fix necessitated injury to tangible property, and the injury was unquestionably physical.

Thus, the repair costs and damages for the downtime were "property damages" covered by the policy unless Exclusion M applies. As explained above, Exclusion M denied coverage of damages to impaired property—defined by the policy as property that could be "restored to use by the . . . replacement" of the faulty flanges. U.S. Metals concedes that if the flanges had been screwed onto the pipes, removal and replacement would have been a simple matter, readily restoring the diesel units to use, and making them "impaired property". But because the flanges were welded in, U.S. Metals argues, restoring the diesel units to use involved much more than simply removing and replacing the flanges alone, and therefore the diesel units were not "impaired property" and Exclusion M does not apply.

We disagree. The policy definition of "impaired property" does not restrict *how* the defective product is to be replaced. U.S. Metals' argument requires limiting the definition to property "restored to use by the . . . replacement of [the flanges]" *without affecting or altering the property in the process*. That limitation cannot be fairly inferred from the text itself, nor would it make sense to do so. In U.S. Metals' view, the diesel units could not be restored to use by replacement of the flanges, not only because they had to be cut out and welded back in, but because of the wholly incidental replacement of insulation and gaskets. Coverage does not depend on such minor details of the replacement process but rather on its efficacy in restoring property to use.

The diesel units were restored to use by replacing the flanges and were therefore impaired

13

property to which Exclusion M applies. Thus, their loss of use is not covered by the policy. But the insulation and gaskets destroyed in the process were not restored to use; they were replaced. They were therefore not impaired property to which Exclusion M applied, and the cost of replacing them was therefore covered by the policy.[26]

III

We come finally to the four questions certified to us by the Fifth Circuit. The first asks whether the terms "physical injury" or "replacement" are ambiguous as incorporated into the "your product" or "impaired property" exclusions of the CGL policy. From all we have said, the answer, in the situation presented, is "no". The second question is conditioned on a "yes" answer to the first, and thus we do not answer it. The third question asks whether installation of the faulty flanges alone physically injured the diesel units. As we have explained in Part II-A above, the answer is "no". For the answer to the fourth question, we refer the Circuit to Part II-B above.

Nathan L. Hecht
Chief Justice

Opinion delivered: December 4, 2015

---

[26] *See Wyo. Sawmills v. Trans. Ins. Co.*, 578 P.2d 1253, 1256–1257 (Or. 1978); *see also DeWitt Constr. Inc. v. Charter Oak Fire Ins. Co.*, 307 F.3d 1127, 1133–1134 (9th Cir. 2002) (applying Washington law); *Esicorp, Inc. v. Liberty Mut. Ins. Co.*, 266 F.3d 859, 863 (8th Cir. 2001) (applying Missouri law).