# NO. 12-24-00024-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| ***EAST TEXAS KIDNEY SPECIALISTS, P.A., VENKATESH REDDY AND GLENN MCDONALD, APPELLANTS*** | § | ***APPEAL FROM THE 124TH*** |
| ***V.*** | § | ***JUDICIAL DISTRICT COURT*** |
| ***RAJIV VIJ, APPELLEE*** | § | ***GREGG COUNTY, TEXAS*** |

### *MEMORANDUM OPINION*

In this interlocutory appeal, East Texas Kidney Specialists, P.A. (ETKS), Venkatesh Reddy, and Glenn McDonald challenge the trial court's temporary injunction in favor of Appellee, Rajiv Vij.[1] We dissolve the temporary injunction and remand the case to the trial court for further proceedings.

### BACKGROUND

Reddy, McDonald, and Vij are physicians and senior shareholders in ETKS, a nephrology practice. When ETKS hired Vij in 2010, Vij signed an employment agreement. Upon becoming a shareholder in 2012, Vij signed a shareholders' agreement as well as a new employment agreement with ETKS.[2] The 2012 employment agreement provides as follows regarding "involuntary termination": "This Agreement may be terminated by [ETKS] without advance notice

---

[1] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(4) (West Supp. 2023) (authorizing interlocutory appeal of temporary injunction).

[2] On August 1, 2012, ETKS executed a document entitled "Unanimous Consent of Directors In Lieu of a Special Meeting of the Board of Directors," by which it issued shares to Vij.

upon the occurrence of . . . the discharge of [Vij] for good cause." The agreement defines "good cause" as, among other things, unprofessional, unethical, immoral, or fraudulent conduct by Vij that discredits ETKS or is detrimental to ETKS's reputation and standing. With respect to "voluntary termination," the agreement provides that ETKS may terminate Vij without good cause by (1) providing him sixty days' written notice or (2) without notice by paying him two months' salary in advance. The employment agreement contains an integration clause, which states: "This agreement contains the entire understanding between the parties hereto concerning the subject matter herein. There are no representations, agreements, arrangements or understandings, oral or written, between or among the parties hereto relating to the subject matter of this Agreement which are not fully expressed herein."

The shareholders' agreement states that the shareholders own all of the issued and outstanding stock of ETKS and "desire to place restrictions upon the transfer of . . . [ETKS's] shares, and to make other provisions with respect to the affairs of [ETKS]." The shareholders' agreement mandates that upon the occurrence of certain events, including a shareholder's retirement, resignation, discharge, or other termination of his or her full-time employment with ETKS, the departing shareholder must sell, and ETKS must purchase, all of the departing shareholder's shares. Additionally, the shareholders' agreement requires ETKS to pay accrued salary and bonus to a shareholder whose employment is terminated due to reasons other than death or retirement, but excludes such a terminated shareholder from receiving any payment for accounts receivable and work in process. Article 10 of the shareholders' agreement provides that if an unresolvable disagreement or management deadlock occurs between Reddy and the other shareholders, Reddy "shall have the right to purchase the shares of stock owned by the other [s]hareholders for a purchase price equal to the original cost paid by such other [s]hareholders for such stock." Article 29 of the shareholders' agreement requires a unanimous vote of the senior shareholders "to approve any actions by the shareholders of the association." The shareholders' agreement contains an integration clause identical to that found in the employment agreement. Further, Article 32 of the shareholders' agreement provides as follows: "This Agreement supersedes any and all prior agreements pertaining to the subject matter herein, including, without limitation, the transfer restrictions and agreements contained in that certain Shareholders' Agreement dated December 1, 2021."

ETKS's bylaws provide as follows:

> The business and affairs of the Association shall be managed by its Board of Directors, who may exercise all such powers of the Association and do all such lawful acts and things as are not by statute or by the Articles of Association or by these Bylaws directed or required to be exercised or done by the shareholders.[3]

Moreover, the bylaws state that the Board of Directors shall elect officers of the Association, including a president, one or more vice presidents, a secretary, and a treasurer. The bylaws identify the president as the "chief executive officer" who "shall have general supervision of the affairs of the Association and shall have general and active control of all its business and operations." The bylaws further give the president of ETKS general authority "to remove or suspend any employee or agent" and "in general to exercise all the powers usually appertaining to the office of president of a corporation, except as provided by statute, the Articles of Association[,] or these Bylaws." Furthermore, the bylaws provide that the Board of Directors may alter, amend, or repeal the bylaws, or adopt new bylaws.

On January 26, 2024, ETKS sent a letter to Vij terminating his employment. The letter was signed by Reddy in his capacity as president of ETKS. In the letter, Reddy stated, "ETKS has chosen to take this action for numerous reasons, including your inability to act as a Medical Director at any DaVita facility . . ., your unwillingness to agree to extend ETKS'[s] and/or related entities' relationship with DaVita, and your views on the future path for ETKS." Moreover, the letter informed Vij that as of the date of the letter, he may not provide services to any patient, act on ETKS's behalf, incur any expenses on behalf of ETKS, or be present on ETKS's premises. The letter instructed Vij to immediately return any ETKS property in his possession and to "remov[e] from your computer and all of your personal electronic devices any and all ETKS . . . information and data and otherwise returning any and all ETKS . . . information or documents in your possession, custody, or control."

---

[3] The record indicates that ETKS was previously named "Shobha Shakamuri, M.D., P.A.," and the association's bylaws are entitled "Bylaws of Shobha Shakamuri, M.D., P.A." Shakamuri signed Vij's employment agreement as president of ETKS, and she signed the 2012 shareholders' agreement in two capacities: as a shareholder and as president of ETKS. Nothing in the record indicates that ETKS is not the same entity as Shobha Shakamuri, M.D., P.A., or that the bylaws did not remain in effect after the entity's name change in 2005, and neither party makes those arguments on appeal. Rather, Vij argues that the shareholder agreement superseded both the bylaws and his employment agreement.

On February 1, 2024, Vij sued Appellants, asserting claims for alleged breaches of the shareholders' agreement and employment agreement, and seeking temporary and permanent injunctive relief to prohibit Appellants from, among other things, (1) communicating with hospitals, patients, and the public regarding his "improper" termination; (2) restricting him from entering ETKS facilities; (3) restricting him from treating his patients; (4) restricting his access to his patients and records; (5) restricting his rights "as a member or senior shareholder of ETKS; (6) taking "shareholder action" without the unanimous consent of the senior shareholders, including Vij; (7) destroying, concealing, or disposing of any records pertaining to Vij's patients; and (8) destroying, concealing, or disposing of any paper or electronic records relating to Vij's termination, ETKS's rescinding of the DaVita non-renewal letters, or "any other issues pertinent to this lawsuit." In his petition, Vij asserted that ETKS breached both the 2023 shareholders' agreement and his 2012 employment agreement by improperly terminating him. Vij further contended that (1) the shareholders' agreement required a unanimous vote of all the outstanding shares of stock to approve any actions by the shareholders, (2) his termination violated both the shareholders' agreement and his employment agreement, and (3) the shareholders' agreement superseded any and all prior agreements.

The trial court signed a temporary restraining order and conducted an evidentiary hearing on Vij's application for temporary injunction. At the hearing, Vij testified that he joined ETKS as an employee in 2010 and became a senior shareholder with ETKS in 2012. Upon becoming a shareholder, Vij signed a new employment agreement and a shareholders' agreement. Vij stated that he paid "[n]othing" for his shares of ETKS. ETKS currently has five shareholders, but Vij, Reddy, and McDonald are the only senior shareholders. When asked how decisions are made regarding the conduct of ETKS's practice, Vij testified, "We all decide as a group, and then . . . the vote is . . . by the senior shareholders regarding every important decision." Additionally, when asked whether decisions about hiring and firing of doctors and other staff were made "by the senior shareholders by vote" or "unilaterally by Dr. Reddy[,]" Vij testified, "[a]bsolutely by vote by senior shareholders." He explained that he never received a copy of ETKS's bylaws and had never seen them.

Vij testified that the 2012 shareholders' agreement only required a two-thirds vote for the shareholders to take action, but the 2021 shareholders' agreement required a unanimous vote of the shareholders to take action because "Dr. McDonald was concerned that the shareholders would

4

have the 66 percent of the votes, and he wanted protection against being terminated." Vij explained that he agreed with the unanimity provision because he also wanted such protection. When asked whether he believed the provision would protect him from being "voted out" from his employment and his position as a shareholder, Vij testified, "That was my understanding." According to Vij, the 2023 shareholders' agreement, which superseded the 2021 agreement, also required unanimity of the senior shareholders for the shareholders to act.

Vij testified that ETKS contracts with DaVita, a company that provides dialysis, to provide medical director services. According to Vij, ETKS generally signs ten-year contracts with DaVita for ETKS's patients who need dialysis, and "all the physicians are supposed to sign . . . a joinder agreement." The medical director is responsible for the functioning of the dialysis unit, and DaVita paid ETKS a lump sum for medical directorship. At a 2023 DaVita conference in San Diego, Vij was accused of touching a woman's back and head while he was intoxicated, and he was asked to leave. Vij testified that he was intoxicated and explained that he does not remember the incident. As a result of the incident, DaVita required Vij to take a voluntary leave of absence, take a professional boundaries course, and undergo a physician health evaluation, and Vij did so. Additionally, Vij testified that although DaVita agreed to allow him to resume seeing patients at DaVita facilities, DaVita would not permit him to serve as a medical director at its facilities because of the incident. Vij estimated that revenue from ETKS's relationship with DaVita constitutes "30 to 40 percent" of ETKS's total revenue. Vij explained that a physician who is not a medical director is still permitted to serve as an attending physician for patients at DaVita facilities, and Vij was doing so when ETKS terminated him.

Vij testified that ETKS's senior shareholders "never said" that his conduct at the conference hurt ETKS's reputation, and they did not cite the incident to him as a reason for his termination. According to Vij, after he completed all of DaVita's requirements, DaVita "basically said that they had no problem whatsoever [with] me returning back to rounding, and they approved me to come back." Vij explained that ETKS did not lose any revenue as a result of the incident at the DaVita conference, and when asked if he is aware of "anything detrimental" happening to ETKS as a result of the incident, Vij stated, "None." Vij testified that DaVita wanted a "no objection letter" from ETKS before reassigning his DaVita patients to him, but the ETKS shareholders refused to give him such a letter, resulting in his inability to resume serving as attending physician for his patients at DaVita. Vij testified that in June 2023, ETKS sent DaVita

a notice of nonrenewal "based on a unanimous decision that we needed to renegotiate before the current contract with DaVita expired on January 3, 2024." According to Vij, ETKS ultimately signed an amended medical director agreement with DaVita "that [Vij] had never seen."[4]

Vij testified that Reddy asked him to meet on January 26, 2024, and when Vij arrived, Reddy, McDonald, Patel, and Shrivastava were all present. Reddy told Vij that because Vij could not serve as a medical director at DaVita, Vij had a "different vision" for ETKS, and Vij would not agree to decreasing the compensation for medical director fees, "we have all decided to terminate you[.]" According to Vij, they attempted to hand him a letter terminating his employment, but he instructed them to send the letter to his attorney. In the letter, ETKS stated that Vij's patients were the property of ETKS and Vij should not continue to care for them. Vij's counsel responded with a letter asking ETKS to rescind the termination letter, and ETKS's counsel responded that (1) Vij was an at-will employee and (2) his termination did not constitute an action by the shareholders. The letter from ETKS's counsel did not state that the DaVita incident constituted good cause for Vij's termination because it involved unethical, immoral, or disparaging behavior. Vij testified that he is currently not permitted to serve as a director of any DaVita facility because of the incident at the San Diego conference.

During cross-examination, Vij agreed that the shareholders' agreement only supersedes prior agreements pertaining to issues addressed in the shareholders' agreement. Vij testified that an action by the shareholders under the shareholders' agreement "requires a [one] hundred percent vote[,]" and Vij characterized the termination of a senior shareholder as an action by the shareholders. In addition, Vij agreed that he is an employee of the professional association, a shareholder, and a member of the board of directors of the professional association, and Reddy is president of ETKS. When asked whether "there is as management deadlock right now of the managers of the professional association[,]" Vij responded, "Yes." When asked about the provision in his employment agreement which provided that he could be terminated without cause by delivery of sixty days' notice or payment of two months of his base salary in advance, Vij responded, "My understanding is that the 2023 shareholder agreement supersedes that." Vij

---

[4] Appellants state in their brief, and Vij testified at the hearing on his application for temporary injunction, that another ETKS entity, ETKS Professional Services, PLLC, contracts with DaVita. ETKS Professional Services, PLLC and DaVita are not parties to this appeal.

explained, "My understanding of the 2023 shareholder agreement is that the senior shareholders' actions, any action requires [one] hundred percent vote."

McDonald testified that he believes Reddy can provide notice of deadlock and buy out shareholders for the purchase price of the stock and any remaining salary owed to the shareholders. McDonald explained that he supports ETKS's termination of Vij, and he does not want to continue his partnership with Vij in ETKS. According to McDonald, after the incident at the DaVita conference, Vij no longer supported protecting ETKS's relationship with DaVita, and Vij "was going [in] a very different direction than everybody else[.]" When asked whether he felt that Vij was putting his own interests above those of ETKS, McDonald responded, "Absolutely." McDonald testified that unanimity was not required when making decisions regarding ETKS; rather, "[w]e come to consensus usually." McDonald cited as an example his desire to hire a physician to grow the practice and explained that the "rest of the group did not want to hire that physician. At that point, it's a group decision. So[,] in those decisions, the hundred percent doesn't always work, and Dr. Reddy comes in and usually will decide a consensus." McDonald expressed concern that Vij's conduct at the DaVita conference "would hurt everything[,]" and he opined that the incident marred ETKS's image. According to McDonald, the termination letter, which was drafted by ETKS's attorneys, was not intended to constitute an exhaustive list of the reasons for Vij's termination.

Reddy testified that he is a shareholder and director of ETKS, as well as its president. Reddy explained that he made the decision to terminate Vij for multiple reasons, including Vij's misconduct, Vij's opposition to signing a lucrative ten-year agreement with DaVita, and the fact that Vij "was going in a different direction." According to Reddy, he no longer desires to be in business with Vij, and he possesses authority as president of ETKS to terminate Vij. Reddy opined that he had good cause for terminating Vij, and Reddy stated that he was prepared to exercise his right to buy out the other shareholders if necessary.

After hearing the parties' closing arguments, the trial judge stated as follows:

> [T]he Court has considered all the testimony and the arguments. The testimony today is that Dr. Vij was fired or terminated . . . mainly because of his behavior in San Diego at the DaVita conference. The other answer was also that there was an unresolvable disagreement between the shareholders.
>
> On his notice of termination letter . . ., it stated that the action was taken for numerous reasons including his inability to act as a medical director at any DaVita facility and unwillingness

7

to agree to extend the relationship with DaVita. No mention of the San Diego event. No mention of any of the other things. . . .

Based on all the testimony and the evidence introduced, the Court finds that there is a valid cause of action filed by the Plaintiff. They have demonstrated probable right of relief under the current state of the pleadings and the facts. They've also established probable, imminent, and irreparable injury that damages cannot accurately be calculated on. . . . The Court is not saying that the Defendants may not have had valid reasons to terminate him. They only c[a]me up with them today, not when this was done.

So, under these facts and circumstances, I'm going to convert the temporary restraining order into a temporary injunction. The Court further finds . . . that the Defendant has violated both the . . . shareholder and employment agreements. Further, that Dr. Vij, under the 2012 employment agreement, is no longer an employee at will.

The trial judge ultimately signed a temporary injunction order in favor of Vij on February 14, 2024, in which he found that the 2023 shareholders' agreement provides that "any action of the ETKS shareholders requires the unanimous vote of the senior shareholders (Drs. Reddy, McDonald, and Vij), and it supersedes all other agreements." Additionally, the trial court found that "the termination of one senior shareholder by the other four shareholders constitutes an "action by the Shareholders" under the Shareholder Agreement, and ETKS's shareholders "lacked the requisite unanimous senior shareholder vote to take the action of sending Dr. Vij a termination letter." The order also specifically incorporated the trial judge's oral findings from the hearing.

The trial court further found that (1) Vij is not an at-will employee under the 2012 employment, and he may only be terminated for good cause; (2) "ETKS and its shareholders terminated Dr. Vij without good cause under the Employment Agreement[;]" (3) because Vij would likely demonstrate at trial that Appellants breached the shareholders' agreement and the employment agreement, Vij "is likely to demonstrate at trial that he was improperly terminated by the [Appellants;]" and (4) immediate relief was necessary to protect Vij's rights because Appellants "are presently engaged in, or will imminently engage in, unlawful activities," including communicating with hospitals, patients, and other "stakeholders regarding ETKS's improper termination of Dr. Vij;" restricting Vij from entering ETKS's facilities and treating and caring for his patients; restricting Vij from accessing his patients' records; restricting Vij's rights as a member or senior shareholder of ETKS; and "taking shareholder action without unanimous consent of the senior shareholders." Moreover, the trial court concluded that "the harm is irreparable because of the lack of any remedy at law to adequately compensate Dr. Vij for the

damage which may be done to Dr. Vij's patient relationships, reputation in the community, and rights as a shareholder of ETKS."

The trial court temporarily enjoined Appellants from (1) "communicating with any hospital, patient, stakeholder, or other person regarding the [Appellants'] action to improperly send Dr. Vij a termination letter"; (2) restricting Vij from entering ETKS or its affiliate facilities; (3) restricting Vij from treating and caring for his patients; (4) restricting Vij from accessing his patients' records; (5) restricting Vij's rights as a member or senior shareholder of ETKS; (6) taking shareholder action without the unanimous consent of the senior shareholders, including Vij; (7) destroying, concealing, or disposing of any paper or electronic documents regarding Vij's patients; and (8) destroying, concealing, or disposing of documents, electronic files, paper, emails, text messages, or other materials relating to the shareholders' actions terminating Vij, rescinding the DaVita non-renewal issues, or "any other issues pertinent to this lawsuit." Additionally, the trial court ordered the parties to mediation and, in an amended temporary injunction order, set the case for trial on July 15, 2024. This interlocutory appeal followed.[5]

### TEMPORARY INJUNCTION

Appellants raise two issues challenging the trial court's granting of a temporary injunction in favor of Vij. In issue one, Appellants maintain that the trial court abused its discretion in granting a temporary injunction because the trial court (1) erroneously interpreted the governing agreements, (2) reinstated Vij's employment with ETKS and enjoined ETKS from terminating him in the future, (3) created an unresolvable disagreement and management deadlock, (4) prevented Reddy from purchasing Vij's shares when an unresolvable disagreement and management deadlock occurred, and (5) prohibited them from discussing Vij's termination, which Appellants argue constitutes an unconstitutional prior restraint on their right to free speech. In issue two, Appellants contend that the trial court abused its discretion by granting injunctive relief because

---

[5] After Appellants filed their notice of appeal, Reddy filed a motion with the trial court to "clarify" the temporary injunction and to allow him to exercise his rights pursuant to Article 10 of the shareholders' agreement, contending that (1) an unresolvable disagreement or management deadlock existed and (2) his exercise of the rights under Article 10 would not constitute an action by the shareholders. The trial judge conducted a hearing and ultimately issued a letter ruling, in which he stated that the purpose of a temporary injunction is to maintain the status quo while awaiting an expedited trial setting and noted that the case is set for trial in July 2024. After concluding that the relief Reddy sought "would basically nullify the temporary injunction and the status quo" and irreparably harm Vij, the trial court denied Reddy's motion and left the temporary injunction in place.

9

Vij did not demonstrate irreparable harm and an adequate remedy at law exists.

**Standard of Review and Applicable Law**

"A temporary injunction is an extraordinary remedy and does not issue as a matter of right." ***Butnaru v. Ford Motor Co.***, 84 S.W.3d 198, 204 (Tex. 2002). Because the decision regarding whether to grant a temporary injunction lies within the trial court's sound discretion, an appellate court should reverse an order granting injunctive relief only if the trial court abused its discretion. ***Id***. We must not substitute our judgment for that of the trial court unless "the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." ***Id***. If the trial court's conclusion that the applicant has demonstrated a probable right to recovery is not reasonably supported by the evidence, the trial court abuses its discretion by granting a temporary injunction. ***Health Care Serv. Corp. v. E. Tex. Med. Ctr.***, 495 S.W.3d 333, 338 (Tex. App.—Tyler 2016, no pet.) (op. on reh'g). We review the trial court's determinations on questions of law de novo. ***Marketshare Telecom, L.L.C. v. Ericsson, Inc.***, 198 S.W.3d 908, 916 (Tex. App.—Dallas 2006, no pet.); *see also* ***Tenet Health Ltd. v. Zamora***, 13 S.W.3d 464, 468-69 (Tex. App.—Corpus Christi 2000, pet. dism'd w.o.j.).

An applicant for temporary injunction must plead and prove three elements: (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. ***Butnaru***, 84 S.W.3d at 204; ***Harbor Perfusion, Inc. v. Floyd***, 45 S.W.3d 713, 716 (Tex. App.—Corpus Christi 2001, no pet.). An applicant need not establish that he will prevail at trial. ***Dallas Anesthesiology Assocs., P.A. v. Tex. Anesthesia Grp., P.A.***, 190 S.W.3d 891, 897 (Tex. App.—Dallas 2006, no pet.); ***Univ. Health Servs., Inc. v. Thompson***, 24 S.W.3d 570, 576 (Tex. App.—Austin 2000, no pet.). Rather, an applicant must establish that he is entitled to preservation of the status quo pending trial on the merits. ***Walling v. Metcalfe***, 863 S.W.2d 56, 58 (Tex. 1993). In addition, an applicant must demonstrate that he has a probable right to the relief sought "by alleging a cause of action and presenting evidence tending to sustain it." ***Savering v. City of Mansfield***, 505 S.W.3d 33, 39 (Tex. App.—Fort Worth 2016, pet. denied).

**Analysis**

Appellants argue that the shareholders' agreement supersedes only prior agreements regarding matters pertaining to the subject matter therein, while Vij argues that the shareholders' agreement superseded both ETKS's bylaws and his employment agreement. ETKS is a professional association, and the Texas Business Organizations Code (BOC) governs professional

associations. The BOC defines a professional association as "an association, as distinguished from either a partnership or a corporation, that is: (A) formed for the purpose of providing the professional service rendered by a doctor of medicine . . .; and (B) governed as a professional entity under this title."[6] TEX. BUS. ORGS. CODE ANN. § 301.003(2) (West 2020). Except as provided by Title 7 of the BOC,[7] "a professional association has the same powers, privileges, duties, restrictions, and liabilities as a for-profit corporation." *Id*. § 2.108 (West 2020). Therefore, the provisions of Chapters 20 and 21 of the BOC, which govern for-profit corporations, also "apply to a professional association, unless there is a conflict with [Title 7 of the BOC]." *Id*. § 302.001 (West 2020). The BOC provides that "[a] professional association shall be governed by: (1) a board of directors; or (2) an executive committee." *Id*. § 302.005(a) (West 2020). The word "shall" "imposes a duty[]" and indicates a mandatory directive. TEX. GOV'T CODE ANN. § 311.016 (2) (West 2013) (Code Construction Act); *Morath v. Lampasas Indep. Sch. Dist.*, 686 S.W.3d 725, 738 (Tex. 2024) (noting that "shall" is a "mandatory directive"); *see also* TEX. BUS. ORGS. CODE ANN. § 1.051 (West 2020) (providing that Code Construction Act applies to BOC unless BOC expressly provides otherwise).

Common law rules of contract construction apply to the shareholders' agreement. *See Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 443 (Tex. 2017) (applying common law rule of contract construction to forum-selection clause in shareholders' agreement). When construing a contract, courts presume the parties intended for all of its terms to have meaning and give effect to all of its provisions so that none will be rendered meaningless. *Id.*; *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 23-24 (Tex. 2016); *CNOOC Se. Asia, Ltd. v. Paladin Res. (Sunda) Ltd.*, 222 S.W.3d 889, 895 (Tex. App.—Dallas 2007, pet. denied); *Fed. Deposit Ins. Corp. v. K-D Leasing Co.*, 743 S.W.2d 774, 776 (Tex. App.—El Paso 1988, no pet.). Courts give undefined words "their plain, ordinary, and generally accepted meanings absent some indication of a different intent." *U.S. Metals*, 490 S.W.3d at 23. "To the extent of any conflict, specific provisions control over more general ones." *Grynberg v. Grey Wolf Drilling Co., L.P.*, 296

---

[6] A "professional entity is defined as "a professional association, professional corporation, or professional limited liability company." TEX. BUS. ORGS. CODE ANN. § 301.003(4) (West 2020).

[7] Title 7 encompasses Sections 301.001 through 303.006, which contain specific provisions governing professional associations, professional corporations, and professional limited liability companies.

S.W.3d 132, 137 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (citing *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133-34 (Tex. 1994)).

The shareholders' agreement contains provisions addressing the following: (1) restriction of shareholders' ability to "sell, pledge, transfer, assign, or in any way alienate any of their shares" of ETKS's capital stock without ETKS's prior written consent; (2) ETKS's right of first refusal to purchase the offered shares when a shareholder receives "a bona fide offer from a qualified transferee"; (3) requirements that upon a shareholder's death, his or her estate or heirs must sell the deceased shareholder's shares to ETKS within ninety days of the shareholder's death; (4) disposition of a shareholder's spouse's interest if the shareholder dies or divorces his or her spouse; (5) other events triggering mandatory purchase of shares by ETKS, including, among other things, a shareholder's bankruptcy, loss of license, or termination of employment; (6) methods for determining the total purchase price of all shares transferred pursuant to the agreement; (7) how the purchase price of all transferred shares would be payable; (8) methods of computing shareholders' salary and bonus compensation; (9) compensation of a shareholder in the event of termination of employment for any reason, including "resignation or other termination, voluntary or involuntary"; (10) rules and procedures if there is an unresolvable disagreement among the shareholders; (11) a shareholder's ability to discontinue certain on-call duties upon reaching age fifty-five; (12) how required notices must be given and will be deemed received; (13) required endorsements on certificates representing shares of ETKS; (14) ETKS's right to purchase life insurance on any shareholder and be the "sole owner" of such policies; (15) qualifications of transferees of ETKS's capital stock; (16) statement that all patient records and files are the property of ETKS "and not the individual Shareholder employees" and requiring that upon the termination of a shareholder's employment for a cause other than death, disability, or retirement, ETKS "must transfer and deliver to the terminated Shareholder the Patient records and files of the patients regularly treated by the terminated Shareholder for which [ETKS] receives a written directive and authorization from the respective patients"; (17) termination of the agreement twenty-one years after the death of the last survivor of the shareholders and "their now living lineal descendants"; (18) statement that time is of the essence and requirements for strict compliance with all time periods set forth in the agreement; (19) each party agrees to perform any further acts and execute and deliver any further documents reasonably necessary to carry out the agreement's provisions; (20) a severability provision stating that if any provision was found to be unenforceable, the

12

validity and enforceability of the remaining provisions would not be affected; (21) shareholders' rights to enforce the agreement; (22) basic construction rules regarding the agreement; (23) choice of law provision stating that the agreement is governed by Texas law and venue of any dispute "shall be exclusively in Gregg County, Texas"; (24) statement that the agreement binds shareholders' heirs and assigns; (25) whether ETKS may validly purchase shares of its capital stock; (26) various representations and warranties by ETKS; (27) procedures for admission of new shareholders; (28) requirement for a unanimous vote of the senior shareholders to approve "any actions by the Shareholders of [ETKS]"; (29) statement that the agreement may be amended by the written consent of all parties; (30) an integration clause; and (31) statement that the agreement supersedes "any and all prior agreements pertaining to the subject matter herein[.]"

The shareholders' agreement provides that it supersedes "any and all prior agreements pertaining to the subject matter herein, including, without limitation, the transfer restrictions and agreements contained in that certain Shareholders' Agreement dated December 1, 2021." The trial court concluded that the shareholders' agreement "supersedes all other agreements" but did not mention or interpret the qualifying phrase which follows: "pertaining to the subject matter herein." If the shareholders intended for the shareholders' agreement to supersede any and all other prior agreements, without limitation, they would not have included the qualifying words ("pertaining to the subject matter herein"). We must construe the phrase "pertaining to the subject matter herein" as having meaning and effect. *See **Pinto Tech. Ventures***, 526 S.W.3d at 443; ***U.S. Metals***, 490 S.W.3d at 23-24; ***CNOOC Se. Asia***, 222 S.W.3d at 895; ***Fed. Deposit Ins. Corp.***, 743 S.W.2d at 776. The plain, ordinary, and generally accepted meaning of "pertain" is "to relate directly to; to concern[,]" "to belong to as a part[,]" or "to belong to as an attribute[.]" BLACK'S LAW DICTIONARY 1328 (10th ed. 2014); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 925 (11th ed. 2011); *see **U.S. Metals***, 490 S.W.3d at 23 (requiring courts to give undefined terms their plain, ordinary, commonly accepted meaning). Moreover, the specific limitation contained within the phrase "pertaining to the subject matter herein" controls over the preceding general provision stating that the shareholder agreement supersedes any and all prior agreements. *See **Grynberg***, 296 S.W.3d at 137.

In its temporary injunction order, the trial court concluded that Vij demonstrated a probable right to the relief sought because the shareholders' agreement supersedes all other agreements and "[t]he ETKS shareholders lacked the requisite unanimous senior shareholder vote to take the action

13

of sending Dr. Vij a termination letter." The trial court relied upon this conclusion in determining that "Vij is likely to demonstrate at trial that the Defendants breached the Shareholder and Employment Agreements." *See **Butnaru***, 84 S.W.3d at 204; ***Savering***, 505 S.W.3d at 39; ***Harbor Perfusion***, 45 S.W.3d at 716. As stated above, the shareholders' agreement acknowledges that a shareholder's employment may be terminated, provides that such a termination would trigger mandatory purchase by ETKS of the terminated shareholder's shares, and governs the compensation to which a terminated shareholder is entitled. But the agreement does not address or mention the requirements for terminating a shareholder's employment or the procedures for doing so, and it does not set forth who has the authority to make and carry out employment decisions, such as termination of employees of ETKS. Additionally, the shareholders' agreement does not address whether good cause is required to terminate an employee or set forth the required notice, if any, to the employee. Rather, as set forth above, the BOC, Vij's employment agreement, and ETKS's bylaws deal with such matters. In other words, both the bylaws and Vij's employment agreement specifically address matters that do not "pertain to the subject matter" discussed or mentioned in the shareholders' agreement. Specifically, Vij's employment agreement contains provisions regarding voluntary and involuntary termination of Vij's employment, sets forth the required notice, and states the instances in which good cause is required for termination. ETKS's bylaws provide that ETKS's affairs "shall be managed by its Board of Directors" and identify ETKS's president as its chief executive officer who "shall" have general and active control of all of ETKS's business and operations, specifically including the general authority "to remove or suspend any employee or agent[.]"

Giving the words of the shareholders' agreement their plain meaning, and presuming that the parties intended for all of the agreement's terms, including the qualifying phrase "pertaining to the subject matter herein," to have meaning and be effective, and applying the rule that the specific controls the general, we conclude that the trial court erred by finding that the shareholders' agreement superseded "all other agreements," including both the bylaws and Vij's employment agreement. *See **Pinto Tech. Ventures***, 526 S.W.3d at 443; ***U.S. Metals***, 490 S.W.3d at 23-24; ***Grynberg***, 296 S.W.3d at 137; ***CNOOC Se. Asia***, 222 S.W.3d at 895; ***Fed. Deposit Ins. Corp.***, 743 S.W.2d at 776. Likewise, the trial court erred by determining, based upon that erroneous finding, that Vij demonstrated a probable right of relief. *See **Butnaru*** 845 S.W.3d at 204; ***Savering,*** 505 S.W.3d at 39.

14

We are mindful that we lack jurisdiction to render advisory opinions. ***Layton v. Ball***, 396 S.W.3d 747, 755 (Tex. App.—Tyler 2013, no pet.). As the Texas Supreme Court recently explained, "[t]he distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties." ***Bienati v. Cloister Holdings, LLC***, No. 23-0223, ___ S.W.3d ___, 2024 WL 2869328, at \*3 (Tex. June 7, 2024) (not yet released for publication). When an injunction currently binds the parties pending final judgment, the legal issues presented are not abstract or hypothetical, and the parties have a statutory right to interlocutory review. ***Id***. at \*2-3. A ruling by a Court of Appeals "decides the legality of the temporary injunction and binds the parties until it is otherwise modified or vacated on final judgment, but it does not conclude the parties' dispute." ***Id***. "When an appeal of a temporary injunction involves a question of law, overlap with the issues presented by the underlying merits often occurs. Such a possibility—or even likelihood—does not render an appellate decision on a temporary injunction advisory." ***Id***. Accordingly, our opinion is not to be construed as an evaluation of the merits of the parties' dispute.

## DISPOSITION

We conclude that the trial court erred by finding that the shareholders' agreement supersedes ETKS's bylaws and Vij's employment agreement. We further conclude that the trial court's determination that Vij demonstrated a probable right to relief based upon that finding was erroneous. Accordingly, we immediately ***dissolve*** the temporary injunction and ***remand*** the case to the trial court for further proceedings. We urge counsel and the trial court to proceed expeditiously to a trial on the merits.[8] We need not address issue two or Appellants' remaining arguments in issue one, as they would not result in greater relief. *See* TEX. R. APP. P. 47.1.

GREG NEELEY
Justice

Opinion delivered June 21, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

---

[8] In its amended temporary injunction order, the trial court set the case for trial on July 15, 2024. The trial court has wide discretion to regulate its docket, and nothing in this opinion is intended to affect the trial court's discretion to retain the trial setting of July 15, 2024, or to otherwise manage its docket with respect to this case. *See* TEX. R. CIV. P. 245; ***Clanton v. Clark***, 639 S.W.2d 929, 931 (Tex. 1982) (holding that trial court has "wide discretion in managing its docket," as well as "a duty to schedule its cases in such a manner as to expeditiously dispose of them.").



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**JUNE 21, 2024**

**NO. 12-24-00024-CV**

**EAST TEXAS KIDNEY SPECIALISTS, P.A., VENKATESH REDDY, AND GLENN MCDONALD,**
Appellants
V.
**RAJIV VIJ,**
Appellee

---

Appeal from the 124th District Court

of Gregg County, Texas (Tr.Ct.No. 2024-135-B)

THIS CAUSE came to be heard on the oral arguments, appellate record, and briefs filed herein, and the same being considered, because it is the opinion of this court that there was error in the judgment of the court below, it is ORDERED, ADJUDGED, and DECREED by this court that the temporary injunction of February 14, 2024, be immediately **dissolved**, and the case is **remanded** to the trial court for further proceedings; and that all costs of this appeal are hereby adjudged against the Appellee, **RAJIV VIJ**, for which execution may issue; and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

16